225 P.2d 707

**MOUNTAIN STATES TEL. & TEL. CO. v. SAKRISON et al.**

No. 5236.

Supreme Court of Arizona.

Dec. 29, 1950.

220

Fennemore, Craig, Allen & Bledsoe, Phoenix, for appellant.

D. Kelly Turner, Phoenix, for appellee, Employment Security Commission.

UDALL, Justice.

Due to a failure in wage negotiations, a nationwide strike by the employees of affiliated telephone and telegraph companies in the United States occurred on April 7, 1947. In the state of Arizona this strike was directed against three companies operating herein, viz.: the American Telephone and Telegraph Co. (parent company of the Bell System) and its subsidiaries, the Western Electric Co. and the Mountain States Telephone and Telegraph Co., the latter two having their business offices in the same building in the city of Phoenix. Upon applications being made, decisions were rendered by a Special Deputy and the Employment Security Commission of Arizona disallowing unemployment compensation benefits to employees of the American Telephone and Telegraph and Western Electric companies, and no appeal having been taken therefrom, these decisions became final. The present controversy, which is solely with the Mountain States Co., arises under the "Employment Security Act of Arizona", hereinafter called the Act, Ch. 56, art. 10, as amended. See Cumulative Pocket Supplement, A.C.A.1939.

Appellee R. L. Moore and 245 others filed application for unemployment compensation with the Employment Security Commission of the State of Arizona, for loss of employment during the period April 7 to May 20, 1947. All claimants were employees of appellant, Mountain States Telephone and Telegraph Co., a corporation doing business in the states of Idaho, Montana, Wyoming, Utah, Colorado, New Mexico, and El Paso County, Texas, as well as in Arizona. The parties will hereinafter be referred to as the commission, claimants or employees, and the company.

Special Deputy D. Kelly Turner, who made the initial investigation regarding the claims under the provisions of Sec. 56-1006a, conducted extensive hearings and rendered separate decisions covering claim-

ants from four geographical areas of the state. Deputy Turner did not consider the company's statewide operations as a single "establishment" under the Act, but in his view the company's four departments were to be treated separately and independently. He held that some claimants were qualified and some disqualified to receive benefits. The company, as well as the claimants who were denied compensation benefits, appealed to the commission. The latter considered the record made before the deputy, and after conducting additional hearings found that the very nature of the company's business and its operations required the conclusion that the statewide system constituted a "single establishment" for the application of the Act. The commission's decision (Chairman John M. Sakrison dissenting) was to the effect that in the light of the statewide picture the strike did not cause a curtailment of operations sufficient to constitute a work stoppage, and hence the 246 claimants here involved were not disqualified under Sec. 56-1005(d) from receiving the benefits provided for in the Act.

The company, deeming itself aggrieved by the final decision of the commission, petitioned the superior court for a review of the record made before the inferior tribunals as provided for under Sec. 56-1011n. From a judgment of the Superior Court of Maricopa County rendered March 17, 1949, affirming in all respects the decision of the commission, the company prosecutes this appeal.

It should be noted that under the Act, Sec. 56-1006a, when the superior court affirmed the decision of the commission the claimants were paid their unemployment benefits, hence in reality, from a financial standpoint at least, the only thing that abides the final decision of this court is whether the payments already made to claimants shall be charged on the commission's books against the account of the appellant company. There are, of course, grave questions of law to be determined.

█ There is no dispute as to the facts. The evidence, in the main, came from the company's books and records, which both sides have for the purpose of this appeal accepted as being true. Hence the differences that have arisen stem from the legal conclusions drawn by the commission and the trial court from those facts. In this situation we are not bound by the conclusions of either the commission or the trial court, but are at liberty to draw our own legal conclusions from the admitted facts. Maricopa County Municipal Water Conservation Dist. v. Southwest Cotton Co., 39 Ariz. 65, 4 P.2d 369; Wilkinson v. Takesuye, 66 Ariz. 205, 185 P.2d 778.

The gist of the company's first ten assignments of error is that the trial court erred in affirming the action of the commission in the premises by decreeing that

the 246 claimants were entitled to unemployment compensation benefits, and in finding that they were not disqualified under the provisions of Sec. 56-1005(d). The company asserts that such decision and judgment are unsupported by competent, material, and substantial evidence, and that the action of the court in affirming the commission decision was arbitrary and capricious. Sec. 56-1011n(a), (7), (E) and (F):

The primary issues determinative of this appeal, therefore, involve two questions arising from the meaning to be given to certain terms in Sec. 56-1005(d) of the Act. These questions are: (1) What is meant by the words "establishment or other premises"? and (2) What degree of curtailment of operations at an "establishment or other premises" constitutes a "stoppage of work"? Stated another way, did the Employment Security Commission (and the trial court) err in its findings of fact and its conclusions of law drawn therefrom in deciding that there was not a "stoppage of work" at the establishment of the Mountain States Telephone and Telegraph Company?

Establishment or other premises.

The Act, Sec. 56-1005, in prescribing disqualification for benefits, states:

"An individual shall be disqualified for benefits:

\* \* \* \* \* \*

"(d) For any week with respect to which the commission finds that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute, strike or lock-out at the factory, *establishment, or other premises* at which he is or was last employed. This provision shall not apply if it is shown to the satisfaction of the commission that: (1) he is not participating in, financing, or directly interested in the labor dispute, strike or lock-out which has caused the stoppage of work; and (2) he does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute, strike or lock-out. *In the case of separate branches of work which are commonly conducted as separate businesses in separate premises, each such department shall, for the purposes of this subsection, be deemed to be a separate factory, establishment or other premises.*" (Emphasis supplied.)

There is no question here as to the exceptions, i. e., as to the claimants participating in, financing, or being directly interested in the labor dispute or belonging to a grade or class, members of which participated in, financed, or were directly interested in the strike in question. Hence such claimants can qualify only for benefits if there was no work stoppage.

The first issue with which we are concerned is the meaning of "establishment, or other premises", and we submit that no simple definition can be found that will be all-inclusive or meet the varying situations that are bound to arise in the administration of this Act.

The company operates 39 exchanges in Arizona. The decision of the deputy appointed by the commission segregated the employees of the company into four departments—traffic, plant, commercial and accounting—for each exchange, upon the theory that each department in each exchange constituted a "separate establishment" within the purview of the statute.

This separation was contested at the appeal hearing and the commission found that while the departments in each exchange were separable on a functional, personnel, accounting, and direct supervisory basis, they were interdependent to such an extent that continued operation of the exchange would be impossible if the functions of any one department were eliminated. Furthermore, it found: (a) that all departments were generally housed within the single building of a community exchange; (b) that billings for local service were handled by the accounting department at the central office in Phoenix; (c) that each exchange was interdependent for its long distance service upon other exchanges, both within and without the state; (d) that company operations are conducted on the basis of a statewide organization and that all exchanges are subject to central (state) supervision and control; and (e) that for rate-making purposes and taxing purposes the operations within the state are treated as a single unit. Considering all of these factors the commission decided that the nature of the company's business and operations required the conclusion that the statewide system constituted a "single establishment" for the application of the statute.

No decisions from appellate courts involving the telephone and telegraph industry in unemployment compensation cases were cited to us by counsel. There are, however, opinions concerning other businesses that by analogy are very persuasive. See the two companion cases from the Supreme Court of California, American-Hawaiian S. S. Co. v. California Employment Commission, Cal.App., 128 P. 2d 627, affirmed 24 Cal.2d 716, 720, 151 P.2d 213, and Matson Terminals, Inc., v. California Employment Commission, 24 Cal.2d 695, 151 P.2d 202, 208, where "establishment" was defined as the place or area of employment. The two cases arose out of a San Francisco longshoremen's strike, and it was held that the docks of all steamship companies along the water front constituted the "establishment" at which the claimants were last employed. In the case of Alaska Unemployment Compensation Commission v. Aragon, 329 U.S.

**224**

143, 67 S.Ct. 245, 250, 91 L.Ed. 136, the Supreme Court of the United States held that there was a labor dispute at the "establishment" of the claimants who were employees in the Alaska fishing industry even though the negotiations between employees and cannery owners were carried on in San Francisco and Seattle. Cf. General Motors Corp. v. Mulquin, 134 Conn. 118, 55 A.2d 732.

■ We are convinced that the commission and the superior court did not err in deciding that the company's statewide system constituted a "single establishment" for the application of the statute. This conclusion has, as Chief Justice Vinson said in the Aragon case, supra, "warrant in the record" and "reasonable basis in law".

### Stoppage of Work.

The major question for our determination in the instant case, one of first impression in this jurisdiction, is what degree of curtailment of operations constitutes a "stoppage of work" within the meaning of Sec. 56-1005(d), as amended. In the case of Sakrison v. Pierce, 66 Ariz. 162, 185 P.2d 528, 173 A.L.R. 480, this court had occasion to determine whether the term referred to the employer's plant operations or to the employee's labor. It was there held that the reference made was to the employer's plant operations. What constitutes a work stoppage sufficient to disqualify applicants for benefits under the Act was not there presented for determination, and our statement, 185 P.2d at 533, that the dispute must result in "the virtual closing down" of the business before compensation would be denied was necessarily dictum.

Unfortunately, the legislature has given us no aid in construing the meaning of the term "stoppage of work". It is neither defined nor explained in the Act. Webster's International Dictionary (2nd Ed.) defines the term stoppage: "(1) Act of stopping, or arresting motion, progress, or action; also, state of being stopped; a halt; obstruction, as on a street, in a waterpipe, etc.; a block."

Administrative bodies and courts that have been confronted with defining the term have rejected the literal definition of stoppage. The Veteran's Administration, however, constitutes an exception, and under the Servicemen's Readjustment Act of 1944, Public Law 346, 38 U.S.C.A. § 693 et seq., has interpreted the phrase to mean a complete halt to or cessation of activities. See Decisions of the Administrator, RAR-U-352. The term "stoppage of work" has also been used in the trade dispute disqualification provisions of the various British unemployment insurance acts since 1911. The British administrators have held that the disqualification for benefits applies if the stoppage was "appreciable," and, in the final analysis, their decisions apparently turn on the number of job va-

cancies. This restrictive construction has been rejected by practically all of the administrative bodies and courts of this country, and a more liberal rule, which takes into consideration all factors affecting operations of the employer's business, is used.

An examination of the reported cases construing statutes similar to our own indicates that by the term "stoppage of work" is meant a substantial curtailment of operations. Magner v. Kinney, 141 Neb. 122, 2 N.W.2d 689, 692; Walgreen Co. v. Murphy, 386 Ill. 32, 53 N.E.2d 390, 393; Lawrence Baking Co. v. Michigan Unemployment Compensation Commission, 308 Mich. 198, 13 N.W.2d 260, 263, 264, 154 A.L.R. 660; Carnegie-Illinois Steel Corp. v. Review Bd. of Ind. Employment Sec. Div., 117 Ind.App. 379, 72 N.E.2d 662, 667. See also Sakrison v. Pierce, supra, where the choice of language as to work stoppage, under circumstances entirely different from those now before us, was somewhat unfortunate. Both parties in the instant case apparently agree that substantial curtailment of operations is the correct rule to follow. The difficulty comes in applying the rule. In this case the question is squarely presented: Was the curtailment of operations sufficient to constitute a stoppage of work within the meaning of the Act, i. e., was it a substantial or material curtailment?

The commission in the present controversy made findings of fact, and from those findings concluded as a matter of law that there was not a stoppage of work sufficient to disqualify claimants from unemployment compensation benefits. This conclusion was affirmed by the superior court.

The uncontroverted evidence discloses that three primary factors were properly considered by the commission and approved by the court in measuring the degree of curtailment of the employer's operations resulting from the strike. These were: (1) revenue, (2) services rendered, and (3) employment. All three showed a marked decrease as a result of the strike.

The company's revenue, statewide, dropped 66.7%, i. e., down to 33.3% of normal. Although certain exchanges had dial instruments and local service was practically normal at those exchanges, e. g., Phoenix, the long distance business was, of course, affected at all exchanges, and substantially reduced the overall revenue. Statewide the local exchange revenues dropped from a normal of $479,115 to $282,268 during the strike period, or a reduction of 40.9%. Long distance (toll) revenues dropped from a normal of $690,428 to $106,814, or a reduction of 84.5%. The overall figures showed total normal revenues from both exchange service and toll service to be $1,169,543 which was reduced to $389,082, or a reduction as stated above to 33.3% of normal.

As to services rendered by the company, in the plant department (which installs and maintains equipment), the commercial department (which deals with public re-

lations generally), and the accounting department (which does the accounting work for the entire state), service varied from practically nothing to nearly normal. In the traffic department the evidence is uncontradicted that there was a decrease from normal in manual exchanges for local calls (with the exception of the Prescott exchange) of 93%, i. e., down to approximately 7% of normal. Dial exchanges, on the other hand, maintained local service at practically normal. At the time of the strike there were 48,896 dial telephones and 54,430 manual telephones in the state. Normal daily average long distance (toll) calls would have been 19,374, but were reduced to 3,101 by the strike. Total normal number of calls would have been 755,586, but were reduced to 121,017. Long distance (toll) service was only 12% of normal for the whole state.

Concerning its statewide employment totals the evidence is even more striking. Immediately prior to the strike the company employed, in all departments, 1952 non-supervisory workers in Arizona. The morning the strike began 1648 non-supervisory workers failed to report for work. (During the course of the strike, 36 non-supervisory employees straggled back to work.) This sharp decrease in the number of employees reporting for work during the strike amounted to approximately 89% of the total number of employees, i. e., a decrease to 11% of normal. Overtime worked by 185 supervisory personnel, none of whom were on strike, compensated to some extent the reduction in non-supervisory employees, but the amount of overtime was small in view of the overall picture, and did not materially alter the effect of the crippling absence of employees.

We have been unable to find a single case from an appellate court, and counsel have cited none to us, holding that there was no "stoppage of work" within the meaning of such statutes where a strike curtailed an employer's operations as extensively as in the present case. We recognize the impracticability of our fixing definite percentages of curtailment under the Act, and each case, of necessity, must be judged on its own peculiar facts.

Both the commission and the superior court had the above facts before them when rendering their decision that there was no stoppage of work within the meaning of the Act. In view of the fact that the evidence is undisputed, we believe that the conclusion drawn by the commission and approved by the court below was erroneous and had no reasonable basis in law. We hold, as a matter of law, that under these facts there was a substantial curtailment of the employer's operations and that such curtailment constituted a "stoppage of work" within the meaning of the Act. The employees therefore were disqualified under the Act from receiving unemployment compensation benefits.

The last assignment of error is directed against that portion of the commission's order allowing benefits to certain claimants for the period from May 15 to May 20, 1947. The strike against the Mountain States company terminated on May 15, but certain of its employees elected not to return to work until May 20, the date on which the strike against the Western Electric Company ended. These employees failed to report for work because they refused to cross a picket line maintained by the Western Electric employees around the building wherein both companies maintained their business offices in Phoenix. Special Deputy Turner denied these claimants benefits and the effect of Chairman Sakrison's dissent was to uphold him, but the majority of the commission and the superior court ruled otherwise. Sec. 56-1005 of the Act so far as applicable reads: *"Disqualification for benefits.*—An individual shall be disqualified for benefits: (a) For the week in which he has left work voluntarily without good cause in connection with his employment, * * *."

Manifestly the order and judgment allowing benefits for this period were arbitrary and capricious, for the unemployment of such employees was purely voluntary and without good cause. Such employees were clearly disqualified for benefits under the Act.

Judgment reversed.·

LA PRADE, C. J., and STANFORD, PHELPS and DE CONCINI, JJ., concur.