MEADOW GOLD DAIRIES-HAWAII, LTD., AND
FOREMOST DAIRIES-HAWAII, LTD. *v.*
HOWARD WIIG, APPEALS REFEREE,
JOSEPH M. S. MACHIDA, DONALD D. FIGEROA,
AND 348 OTHER CLAIMANTS.

No. 4561.

FEBRUARY 6, 1968.

RICHARDSON, C.J., MIZUHA, MARUMOTO,
ABE AND LEVINSON, JJ.

OPINION OF THE COURT BY MIZUHA, J.

This is a consolidation of two appeals from judgments of the First Circuit Court which affirmed the decisions and orders of the Appeals Referee for Unemployment Compensation against appellant Meadow Gold Dairies-Hawaii, Ltd., and Foremost Dairies-Hawaii, Ltd.

Hawaii Teamsters and Allied Workers, Local 996, is the exclusive bargaining agent of the employees of Meadow Gold and Foremost. Because of an empasse in negotiations for new contracts with the two companies, the union called a strike against both Meadow Gold and Foremost on November 7, 1962. This strike lasted until December 8, 1962, for a total of 33 days. Unemployment Compensation claims were filed by 222 employees of Meadow Gold, and by 128 employees of Foremost, for the

period of November 25 to December 9, 1962. All of these claims were denied by the Unemployment Insurance Division of the Department of Labor and Industrial Relations on the ground that the claimants' unemployment was due to a stoppage of work which existed because of a labor dispute at the premises at which they were last employed. R.L.H. 1955, § 93-29 (d).

Upon appeal, the Unemployment Compensation Appeals Referee reversed the decision of the Unemployment Insurance Division as to both sets of claimants. The referee found that a stoppage of work because of a labor dispute did not exist at either Meadow Gold or Foremost, and that therefore the claimants should be entitled to unemployment compensation benefits.

Based upon the evidence presented to him by the dairy companies in the appeal of the claimants, the referee made these findings of fact as to each dairy company:

*Meadow Gold Dairies-Hawaii, Ltd.*

There were 310 union employees at Meadow Gold and all went on strike. Meadow Gold had 62 non-union employees who continued to work during the strike. The company hired temporary replacements, and the average daily complement of workers was 139.3.

Meadow Gold had 35,000 house-to-house retail customers. It also sold wholesale to stores, military establishments, institutions, and other outlets. During the strike, all retail house-to-house deliveries ceased.

It was agreed that October 1962 was a representative month. Testimony and records presented by Meadow Gold showed that there was a two per cent increase in the production of fresh milk during the strike period. Fresh milk represented over 60 per cent of the total normal volume of business. Meadow Gold was able to process all of the fresh milk brought to the plant. Overall, there was a 18.65 per cent decline in total production during the strike period.

*Foremost Dairies-Hawaii, Ltd.*

There were 225 union employees at Foremost, and all went on strike. Non-bargaining unit employees remained at work, and

were complemented by temporary replacements. Foremost continued operations during the strike with a daily average of 80.67 workers.

Foremost distributes a large volume of its products to about 20,000 house-to-house customers at retail prices, and also sells them wholesale to stores, military establishments, institutions, and other outlets. During the period of the strike, all retail house-to-house deliveries ceased completely.

It was agreed by the parties that October 1962 was a representative month, and that volume of operations during that month could be compared with the volume during the strike period. Testimony and records presented by Foremost showed that there was a ten per cent increase in the production of fresh milk during the strike period over that produced in October 1962. Fresh milk represented slightly over 65 per cent of the total normal volume of business. It was established that Foremost was able to process all of the fresh milk which was brought to the plant. Considering all of Foremost's products, there was a 17.66 per cent decline in production during the strike period.

The facts found by the referee were uncontroverted by the appellants.

The pertinent statute involved here is R.L.H. 1955, § 93.29(d), which disqualifies a claimant for unemployment compensation:

> "For any week with respect to which it is found that his unemployment is due to a *stoppage of work,* which exists because of a labor dispute at the factory, establishment or other premises at which he is or was last employed * * *." (Emphasis added.)

The parties stipulated that a labor dispute existed at both establishments from November 7, 1962, to December 8, 1962. The only issue then is whether the unemployment of the claimants was due to a stoppage of work at the premises where they were employed.

We have held that a "stoppage of work" means a "substantial curtailment of the business activities at the employer's establishment rather than unemployment on the part of the striking em-

ployee." *Inter-Island Resorts, Ltd.* v. *Akahane*, 46 Haw. 140, 148, 377 P.2d 715, 720.

In deciding whether there was a substantial curtailment of business activities at the respective plants, the referee stated:

> "It is obvious that there was a large decline in the number of employees and it is reasonable to presume that the number of manhours worked during the strike likewise declined. Further, the 100 percent curtailment of house-to-house deliveries to over 35,000 customers (Meadow Gold) (20,000 for Foremost) must be considered. However, it was established that the employer was able to process and deliver and supply the demand for fresh milk to its customers and as there was an increase of 2 percent (Meadow Gold) (about 5 percent for Foremost) of fresh milk production which is the major item sold by the employer and since no evidence was introduced which established that customers could not obtain the employer's products, this decision will be based on the volume of production."

The referee then found that overall production decreased 18.65 per cent for Meadow Gold and 17.66 per cent for Foremost. He concluded that there was no substantial curtailment of business activities at either Meadow Gold or Foremost, and accordingly, a work stoppage did not exist. The claimants were thus entitled to the unemployment benefits. We agree.

The appellants contend that the evidence on the whole record establishes that a work stoppage existed. "The only possible explanation for the Referee's 'leap to production' can be his understanding of precedent as necessitating such a course." They point to the uncontroverted findings that the retail deliveries to homes of both companies were stopped completely, that there was a substantial decrease in the number of employees of both companies during the strike, and office and maintenance work were not performed.

In *Cumberland and Allegheny Gas Co.* v. *Hatcher*, 130 S.E. 2d 115, the employer effected a lock-out which kept the gas company's entire work force of 79 men out of work. The company

maintained its distribution of gas to its customers by the work of 17 supervisory and promotional employees. Testimony of an officer of the gas company revealed that the company's overall operations were curtailed by approximately 80 per cent and work in thirteen necessary and essential categories of the gas company's business ceased entirely or were performed only on an emergency basis. The court stated that a stoppage of work means a substantial curtailment of work or operations in the employing establishment and held that no stoppage of work existed.

The determinative factor in the *Cumberland and Allegheny Gas Co.* case seems to be that since the gas reached the customers, there was no "substantial curtailment" even though almost all categories of labor were shut-down, except that needed to produce and distribute the gas.

The facts of the *Cumberland and Allegheny Gas Co.* case are similar to those here. *See Monsanto Chemical Co. v. Thornbrough,* 229 Ark. 362, 314 S.W. 2d 493; *Mountain States Tel. & Tel. Co. v. Sakrison,* 71 Ariz. 219, 225 P.2d 707.

The referee followed the *Cumberland* case, and found that:

> "* * * from the data submitted and the testimony given by the employers, there does not appear to be a substantial curtailment of furnishing a supply of its products through grocery stores and other outlets so that the ultimate consumer was able to continue to procure the employer's products from those sources. In fact, the production of fresh milk increased during the strike period."

The difficulty in determining what percentage decrease in production constitutes substantial curtailment is evident. In *Mountain States Tel. & Tel. Co. v. Sakrison,* 225 P.2d 707, 712, the court stated: "We recognize the impracticability of our fixing definite percentages of curtailment under the Act, and each case, of necessity, must be judged on its own peculiar facts." Professor Williams stated that: "While various facts obviously would enter in, the courts tend to concentrate on the diminution of the activities of production in determining the question of existence of a stoppage of work. The critical breaking point

would seem to be about a 20 to 30 per cent cut in production as being sufficient to establish a stoppage." 8 Vand. L. Rev. 338, 340.

While we agree with appellants that no arbitrary percentage should be set as to when a work stoppage does or does not exist, we cannot say here, as a matter of law, that the referee was incorrect after considering all of the evidence before him, in finding no work stoppages based on the 18.65 per cent production decline at Meadow Gold and on the 17.66 per cent production decline at Foremost.

The appellants rely on *General Electric Co.* v. *Director of the Division of Employment Security*, 349 Mass. 358, 208 N.E. 2d 234 (1965).

There, 22 welders went on strike. Because of the strike, there was no work for other employees who worked hand-in-hand with the welders, and the company was forced to lay them off. All welding work within the plant stopped completely. The company decided to "farm out" the welding operation in order to save the jobs of the remaining employees. The court held that although there was no evidence that end product deliveries were materially curtailed, "[t]here was a work stoppage in the sense that an important segment of the production process was forced out of the company's plant by the labor dispute," and that "[t]he pressure exerted by the strike upon the production process has prevented the company from having a substantial amount of work performed in its own plant." *General Electric Co.* v. *Director of the Division of Employment Security, supra* at 237, 238.

We do not accept the proposition that whenever a labor dispute forces a significant change in an employer's method of operation, or necessitates a part of the production process to leave the plant, there exists a "stoppage of work".

In *Inter-Island Resorts* v. *Akahane, supra* at 150, this court concluded that "actual 'stoppage of work' constituting substantial curtailment at the employer's establishment is the controlling factor under our statute in determining the qualification for benefits." Arguments involving policy based on this interpreta-

tion of "stoppage of work" should be addressed to the legislature rather than the courts.

Judgment affirmed.

*L. H. Silberman* (*Moore, Silberman & Schulze* of counsel) for Meadow Gold Dairies-Hawaii, Ltd., appellant.

*Arthur B. Reinwald* (*Robertson, Castle & Anthony* of counsel) for Foremost Dairies-Hawaii, Ltd., appellant.

*Daniel F. S. Lee,* Deputy Attorney General (*Bert T. Kobayashi,* Attorney General, with him on the brief) for Howard Wiig, Appeals Referee, appellee.

*Benjamin C. Sigal* (*Shim & Sigal* of counsel) for Joseph M. S. Machida, Donald D. Figeroa, and 348 other claimants, appellees.