523 P.2d 105

**EMPLOYMENT SECURITY COMMISSION of Arizona, and Swift & Company, Appellants,**

v.

**AMALGAMATED MEAT CUTTERS & BUTCHER WORKMEN OF NORTH AMERICA, LOCAL NO. 448, Appellee.**

**No. 1 CA–CIV 2029.**

Court of Appeals of Arizona,
Division 1,
Department B.

May 7, 1974.

Rehearing Denied June 27, 1974.

Review Denied Sept. 17, 1974.

Gust, Rosenfeld, Divelbess & Henderson by John C. Wesley, Phoenix, for appellant Swift & Co.

Gary K. Nelson, Atty. Gen., by James A. Tucker, Asst. Atty. Gen., Phoenix, for appellant Employment Security Commission of Ariz.

Ward & Contreras, Ltd by Anderson D. Ward, Phoenix, for appellee.

JACOBSON, Chief Judge, Division 1.

This appeal requires the court to determine whether the rate of production in a meat processing plant falls within the concept of "schedules of production" or "working conditions" as these terms are used in a labor contract.

The appellants, Employment Security Commission of Arizona (Commission) and Swift & Company (Swift) have appealed from the judgment of the Superior Court which reversed a decision of the Commission holding that certain employees of Swift represented by appellee, Amalgamated Meat Cutters and Butcher Workmen of North America, Local # 448 (union) were not entitled to unemployment benefits.

The facts giving rise to this litigation are basically undisputed or where disputed are given the interpretation found by the Commission. In 1968, Swift opened operation of a meat packing plant in Tolleson, Arizona. Prior to that time, Swift was operating other plants in the country under a labor agreement negotiated by Swift and the national representative of the union. (This agreement shall be referred to as the "Master Agreement".) On July 1, 1968,

this Master Agreement, with certain modifications not pertinent here, became effective as to Swift's Tolleson operation.

As part of the meat packing operation, slaughtered livestock must first pass through a beef dressing production line. The animals go through this line suspended on hooks which are moved along by a continuous chain. As the animal moves along this line, the various operations necessary to place the animal in condition to be cooled are performed, such as removing the hide, sawing the animal open, removing the entrails, etc. This moving chain may be stopped at six points along its route. Stoppages are normally made to allow a particular station to complete its part of the operation or to allow federal meat inspectors to perform their function. Stoppages of the chain eight to ten times per hour are considered normal.

The speed with which this chain moves determines, at the beginning, the number of animals killed per hour and consequently, at the end, the number of carcasses placed in the cooler each hour. In between these two points, the speed of the chain also determines how fast each particular station of the operation must perform its duties. The Commission found as a fact that at the beginning of the operation of the Tolleson plant an agreement was reached between Swift and the Union that a chain speed taking 154 head of cattle per hour through the beef dressing production line consisting of 59 men would be considered as a normal output of work.

Swift increased this chain speed without notification to the union. As a result of this increase in speed, discussion ensued with the Union which in September, 1968, resulted in increasing the complement of men on the beef dressing production line to 64. Swift unilaterally continued to increase the chain speed until 170 animals per hour were moving through the beef dressing line. This increase continued to be a subject of disagreement and discussion between the union and Swift and in time was referred to the national

headquarters of both Swift and the union. No resolution of this dispute was forthcoming.

After September 15, 1969, the number of chain stops increased dramatically and consequently the number of head of cattle being placed in the cooler dropped from an average of 143 to 155 an hour to 109 to 138 per hour. Swift considered this action a deliberate slowdown in violation of the Master Agreement and warned the employees working on the beef dressing production line that if production did not increase, disciplinary action would be taken. Production did not increase, and on September 18, 1969, Swift ordered the slaughtering of cattle to be discontinued. Employees on the beef dressing line were suspended as a disciplinary action and because beef dressing is an integral part of Swift's operation, when this section closed down other portions of Swift's plant were also closed.

On October 6, 1969, production resumed at the Tolleson plant as the result of an agreement between the union and Swift that the number of men on the dressing line be increased to 68 and the chain speed be reduced to 160 head of cattle per hour.

Employees of Swift filed for unemployment benefits for the period when the plant was closed down, which action resulted in the present controversy.

The pertinent statute concerning these employees' rights to unemployment benefits is A.R.S. § 23–777 which provides in part as follows:

"A. An individual shall be disqualified for benefits for any week with respect to which the commission finds that his total or partial unemployment is due to a *labor dispute,* strike or lockout which exists at the factory, establishment or other premises at which he is or was last employed.

\*    \*    \*    \*    \*    \*

"B. If the commission, upon investigation, finds that the dispute, strike or lockout *is caused by the failure or refus-*

*al of an employer to conform to the provisions of an agreement or contract between employer and employee . . .* such dispute, strike or lockout shall not render the workers ineligible for benefits." (Emphasis added.)

The parties agree that the Swift employees and Swift were involved in a labor dispute within the meaning of A.R.S. § 23–777. They further agree that whether the labor dispute was caused by the failure or refusal of Swift as employer to conform to the provisions of its agreement with the union requires a determination as to whether increasing the chain speed was within the province of management under the agreement or within the designation of "working conditions" affecting employees which required the prior approval of the union. The applicable provisions of the Master Agreement upon which the parties rely to support their respective positions are as follows:

"10. The Management of the plants and direction of the working forces, including the right to hire, suspend, or discharge for just cause, to assign the jobs, to transfer employees within the plant, to increase and decrease the working force, to determine the products to be handled, produced, or manufactured, the schedules of production, and the methods, processes, and means of production or handling, are vested exclusively in the Company; provided this will not be used for the purpose of discrimination against any employee or to avoid any of the provisions of This Agreement."

\*     \*     \*     \*     \*     \*

"65. Any working conditions now in effect and not covered by this Agreement, or not within the exclusive province of the Company as set forth in Paragraph 10 (Management), will remain in effect unless changed as a result of an agreement between the Local

Union representatives and the plant superintendent. If no agreement is reached locally after a change requested by either the Local Union representatives or the plant superintendent has been negotiated, the questions may be referred by either local party to its respective national headquarters for negotiation and agreement at that level."

It is Swift's position that increasing the chain speed falls under the definition of Article 10 of the Master Agreement vesting management exclusively with the regulation of "schedules of production". On the other hand, the union contends that increasing the chain speed falls within the concept of "working conditions" as set forth in Article 65 requiring the prior approval of the union. If the union is correct, it follows that Swift failed to conform to the Master Agreement, and the labor dispute which arose out of that nonconformance would not disqualify employees from obtaining unemployment benefits under A.R.S. § 23–777(B).

The Commission and Swift first contend that the trial court exceeded its permissible scope of judicial review in reversing the Commission's decision. To review this question additional procedural facts are necessary. After the initial hearing before the Commission in this matter, the Commission entered a decision favorable to the union. Swift then filed an appeal to the Superior Court. The Superior Court subsequently remanded the matter back to the Commission for the purpose of allowing counsel the opportunity to present oral arguments to the Commission. No additional factual testimony was taken. Following oral argument the Commission entered its "Modified Decision" reversing itself and finding in favor of Swift. The modified decision found exactly the same facts as was stated in the original decision with the exception that the later decision found, "That the union acted only by entering into discussion with Swift & Company rep-

resentatives and did not invoke the grievance procedure provided in the Agreement, is prima facie evidence the union did not recognize Swift & Company's actions as a violation of the agreement."

■ The Commission contends the Superior Court review of the Commission decision under A.R.S. § 23–681 is not a trial *de novo* and that the above-quoted finding of fact, if supported by competent evidence, cannot be overturned by the Superior Court. We first recognize that the above finding by the Commission is one of mixed fact and law. The Commission could have found, as a fact, that the grievance procedures set forth by the Master Agreement were not invoked by the Union. However, the legal effect of this fact, if a fact, is a question of law. The trial court is not bound under A.R.S. § 23–681 by legal conclusions drawn by the Commission. Mountain States Tel. & Tel. Co. v. Sakrison, 71 Ariz. 219, 225 P.2d 707 (1950). In our opinion, the question of whether the conduct of Swift as found by the Commission falls within one of two provisions of the Master Agreement is primarily one of law which the trial court was free to determine contrary to the Commission. We therefore hold that the trial court, as an initial matter, did not exceed its permissible review in setting aside the Commission's modified decision.

We must now determine whether the trial court correctly interpreted the contract between the parties.

■ As has been repeatedly stated, the cardinal rule in interpreting a contract is to ascertain, by the language employed by the parties, their intent. Knight v. Metropolitan Life Insurance Co., 103 Ariz. 100, 437 P.2d 416 (1968); Sam Levitz Furniture Co. v. Safeway Stores, Inc., 105 Ariz. 329, 464 P.2d 612 (1970). A corollary to this rule is the admonition that words used by the parties are to be given their normal, ordinary meaning, that words are to be read in the context in which they are used, and the purposes sought to be obtained by the agreement are to be considered. Brady v. Black Mountain Investment Co., 105 Ariz. 87, 459 P.2d 712 (1969).

We first note that this agreement, in a labor relation setting, is, on its face, a comprehensive document covering a myriad of subjects upon which management and labor may disagree. Thus, the agreement concerns itself with hiring policies, dues collections, working hours, wages, overtime, rest and meal periods, holidays, safety equipment, vacations, fringe benefits, seniority, termination, transfers, adjustments of grievances, and in general all those aspects of working conditions which may affect an employee.

In this setting we now analyze the language employed by the parties which give rise to this dispute. In this regard, both the Commission and the union have favored the court with an esoteric discussion concerning philosophies underlying labor agreements and how such philosophies should be used in interpreting this agreement. Needless to say, the philosophies advocated by each side are diametrically opposed. We will forego the temptation of lengthening this opinion into a treatise on the growth and development of labor relations in the United States, and confine ourselves to a legal determination of the respective parties' rights under their written contract. This is for the reason that in reviewing the agreement between the parties we are left with the unshakable impression that this contract was hammered out at arms' length, and whatever vested rights labor or management may have believed they had when they commenced negotiations, these have been merged into their written agreement.

■ We first analyze the provisions of the agreement which Swift contends grants them the exclusive power to change chain speeds. Swift, by this agreement, is given power to "determine products to be handled, produced or manufactured." It is apparent that this language vests management with the exclusive right to determine *what* products it shall produce. Swift is

also given the power to determine "the methods, processes and means of production and handling." Again, it is apparent that this language vests management with the exclusive right to determine *how* its products will be produced. Swift is further given the power to determine "the schedules of production." It is this grant of power which Swift contends gives it the right to control *rate* of production. While the word "schedule" may in certain situations have connotations of a time table, for example, a train schedule or bus schedule, we believe as used in this agreement, "schedules of production" means "[a] plan or proposal for future procedure typically indicating . . . the time and sequence of each operation . . . ." Webster's 3rd. New International Dictionary, (1969). As used in the context of the other grants of managerial power, we are of the opinion that it was the intention of the parties that "schedule of production" means *when,* the "what" and the "how" are to be performed.

We do not believe, however, that granting the power as to when its products will be produced carries with it the power under the agreement to determine unilaterally the speed at which its products will be produced when such determination requires an increase in the speed or rate at which the workman is required to work. In our opinion, the speed or rate at which a workman is required to perform his duties falls within the concept of his "working conditions". In fact, under the master agreement, Swift recognizes that in the context of incentive plans, "output levels" are proper subjects of negotiation between Swift and the Union. While an incentive plan was not applicable at Swift's Tolleson plant, this implicit recognition that output is a "working condition" is inescapable. Also, as the Commission found, the fact that labor and management initially agreed as to what constituted "normal output" is an indication that the parties, at least initially, considered rates at which employees worked to be a "working condition". Since the rate of speed at which the chain moves is directly related to the speed at which an employee is required to perform his work, we hold that this is a "working condition" under the agreement which requires prior approval of the union before it can be changed. Having failed to obtain that prior approval before increasing the chain speed, Swift "failed to conform" to its agreement, thus precipitating a labor dispute. Under A.R.S. § 23–777(B) such a precipitation does not disqualify the workmen involved from obtaining unemployment benefits.

The judgment of the trial court is affirmed.

HAIRE, P. J., and EUBANK, J., concur.