378 F.Supp. 791 (1974)
HAWAIIAN TELEPHONE COMPANY, Individually and on behalf of all employers engaged in interstate commerce within the State of Hawaii, who are subject to the Hawaii Employment Security Law, Plaintiff,
v.
STATE OF HAWAII DEPARTMENT OF LABOR AND INDUSTRIAL RELATIONS et al., Defendants,
and
International Brotherhood of Electrical Workers, AFL-CIO, Local 1357, Intervenor-Defendant.
Civ. No. 74-140.
United States District Court, D. Hawaii.
July 12, 1974.
Jared H. Jossem, Raymond M. Torkildson, Torkildson, Katz & Conahan, Honolulu, Hawaii, for plaintiff.
George Pai, Atty. Gen., Roy M. Miyamoto, Deputy Atty. Gen., State of Hawaii, for defendants.
James A. King, Edward H. Nakamura, Bouslog & Symonds, Honolulu, Hawaii, for intervenor-defendant.

DECISION
PENCE, Chief Judge.
Plaintiff, Hawaiian Telephone Company (TELCO), a public utility, with a state-granted monopoly over telephone communications, seeks injunctive relief against the defendants who operate and direct the State of Hawaii Department of Labor and Industrial Relations (DLIR).
Defendant DLIR, and its director, Hasegawa, with its senior examiner of the Unemployment Insurance Division, Brown, administer HRS Chapter 383, Hawaii's unemployment compensation laws.
By stipulation, IBEW Local 1357 (Union), the union which represents the employees of TELCO, has intervened. Although other sections therefor were alleged, the basis for this court's jurisdiction is under 28 U.S.C. §§ 1331 and 1337.
TELCO is certainly "in commerce" under § 1337 and the question raised is equally certain a federal one under § 1331. The aggregate amount which TELCO would have to pay in to the state's unemployment fund if the state's position is sustained would be over $832,000. If more were needed, as indicated in Almacs, Inc. v. Hackett, 312 *792 F.Supp. 964, 967 (D.R.I.1970): "in equity suits the value to be measured for jurisdictional purposes is the value of the right sought to be protected, here the right to bargain collectively free from state interference, a right which cannot as of this time clearly be valued at less than $10,000."
TELCO allegations satisfy the jurisdictional requirements of both §§ 1331 and 1337. Since TELCO's action is primarily based upon a claim of federal legislative supremacy, a single judge may hear this case.

APPLICABLE STATE LAW
HRS Chapter 383-30, Disqualification for Benefits, provides that an individual shall be disqualified for unemployment benefits under "(4) Labor dispute. For any week with respect to which it is found that his unemployment is due to a stoppage of work which exists because of a labor dispute at the . . . establishment . . . at which he is or was last employed."
In Interisland Resorts v. Akahane, 46 Haw. 140, 377 P.2d 715 (1962), the Supreme Court of Hawaii, fundamentally relying upon the fact that Hawaii's Employment Security Law had its origin in the British Unemployment Insurance Acts, of 1911, adopted the British Umpires construction of the term "stoppage of work" as referring "`not to the cessation of the workman's labour, but to a stoppage of the work carried on in the . . . premises at which the workman is employed.'" 46 Haw. at 147, 377 P.2d at 720. Akahane was an organizational strike. Immediately after being struck the hotel was able to prevent closing down of hotel operations with the help of supervisors and hotel guests, and within a week had hired replacements for the strikers. The strikers in fact were out of their jobs.
In Gaspro v. Labor & Ind. Rel. Comm'n., 46 Haw. 164, 377 P.2d 932 (1962), in a similar organizational strike, Gaspro was almost completely shut down for about five weeks, i. e., until it hired new employees to permanently replace the strikers. Here, too, the strikers were out of their jobs.
In Meadow Gold Dairies v. Wiig, 50 Haw. 225, 437 P.2d 317 (1968), the Dairies with the assistance of non-bargaining unit members and temporary replacements were able to carry on about 82% of their business. The Unemployment Compensation Appeals Referee, applying Akahane, found that there had been no "`substantial curtailment of the business activities at the employer's establishment. . . .'" (50 Haw. at 227, 437 P.2d at 319) and paid unemployment compensation to the strikers.
When employees of the Hawaiian Electric Company, a public utility, struck in February of 1974, because Hawaiian Electric continued to generate and sell electricity during the strike, they were deemed not to be disqualified. The Department of Labor paid unemployment benefits in excess of $100,000 to the striking employees.
Unemployment benefits are paid out of a state fund which is maintained in part by payroll taxes levied against the employers. Subject to a limitation that the employer's tax cannot exceed 3% of the annual payroll, the state law permits an employer's favorable experience to give him a lower tax. For example, TELCO's taxes for 1974 were but 1.6% of annual payroll. In the event that unemployment benefits are paid to its striking employees, those benefits will then be charged against the employer's account and increase its tax rate and contribution.

FINDINGS OF FACT
TELCO is an employer engaged in interstate commerce subject to the jurisdiction of the NLRB, the Federal Social Security Act, and the Hawaii Revised Statutes, Chapter 383, the Employment Security Law, and related rules, insofar as unemployment benefits thereunder may be provided to employees on strike.
On April 30, 1974, the collective bargaining agreements between TELCO and the Union, for the TELCO employees represented by it, terminated. One week *793 later, on May 7, some 3,300 employees of TELCO struck TELCO, left their jobs, and established picket lines at the employer's various places of business in Hawaii.
The Union's first strike bulletin, issued on the very day of the strike, stated among other messages:
"Your shop steward will . . . be able to answer basic questions about unemployment compensation . . . ."
On May 8, the second day of the strike, an article appeared in the Honolulu Star-Bulletin, an evening newspaper, with the largest circulation, entitled "Strikers Can Qualify for Jobless Pay." On that same day, the Department of Labor posted an 18" × 30" sign on the glass front of its Unemployment Insurance Division, stating:
 "Hawaiian Telephone Strikers
 Contact your Union to File
 Your Claim"
On Kauai the Union chairman set up a Saturday, May 11, meeting with state officials to assist the Union in filling out "mass applications" for unemployment benefits. Before that Saturday, the Union was provided with mass claim sheets for unemployment compensation by the State Department of Labor. The May 11, 1974 Union strike bulletin said:
"Our crews are hard at work gathering information and completing forms for unemployment compensation. If you have not applied, contact your picket captain immediately and he or she will make arrangements for you to meet with one of our union members assigned to processing unemployment compensation applications."
During the strike over 3,000 employees who were not working because of the labor dispute signed or had their names placed on the mass claim sheets. Also during the strike the Union, through its officers and members, advised its employees regarding the procedures for filing claims for state unemployment benefits and filed the mass claim applications at the Union's office in Honolulu. Substantially all the claims for benefits filed with the DLIR were filed by the Union via the mass claim sheets.
On May 28, 1974, the striking members voted to reject a company proposal and it was not until June 13, 1974 that a second company proposal was accepted. TELCO's striking employees began to return to work on June 14, 1974. The strike had lasted thirty-eight (38) days.
At a meeting at the Honolulu office of the DLIR on June 17, 1974, defendant Brown, senior examiner of the DLIR, scheduled on informal predetermination hearing for June 27, at which TELCO and the Union were to supply data to enable Brown to determine, with respect to the TELCO strikers, solely whether they were disqualified for unemployment benefits because their "unemployment is due to a stoppage of work which exists because of a labor dispute at the . . . establishment . . . at which he is . . . employed." HRS Chapter 383-30(4). The only issue before Brown would have been whether a "stoppage of work"[1] can be established by TELCO. Unless TELCO were to be able to convince Brown that it had experienced a "substantial curtailment of operations" during the strike, the strikers would be paid unemployment compensation for all strike lost time, save the first seven days. Thereafter in accordance with the provisions of the state act, TELCO would be forced to replenish the state's unemployment compensation fund by paying therein some $832,000.
After the instant complaint was filed, the Pacific Business News of June 20, 1974 reported that John Guzman, business manager of the Union, stated for publication that the Union had notified its members that they could expect to receive unemployment benefits for the period of the strike and that "a lot of the workers have already spent the money without actually getting it and this *794 is worrying our people." Moreover, Guzman was reported as saying that TELCO's opposition to the payment of unemployment benefits manifested an anti-union attitude on the part of TELCO. The Union has not denied these reports.
Although the strike has ended, TELCO and the Union still have a collective bargaining agreement, but TELCO, by state law, is nevertheless still forced into the position of litigating before the DLIR the question of whether its employees who struck should be entitled to receive unemployment compensation benefits. If the benefits are paid they would be charged against TELCO's account, thus forcing TELCO to pay some $832,000 in additional unemployment tax contributions, during 1975. The position of the DLIR is that if the information requested of TELCO did not show a "stoppage of work" as interpreted by the Hawaii decisions, supra, and the strikers were otherwise eligible, they would be paid unemployment benefits for the four weeks and three days of the strike remaining after the first excluded week.

LEGAL ISSUES
The underlying question is whether Hawaii's DLIR is wrongfully intruding in a labor dispute by making available unemployment benefits to strikers who would qualify therefor under the Hawaii Unemployment Compensation laws. The problem is whether such state action as has been heretofore taken in Meadow Gold and Hawaiian Electric alters the relative economic strength of Union vs. employer and thus enters the field preempted by the national policy guaranteeing free collective bargaining, in violation of the Supremacy Clause of the Constitution. Although the strike is ended, the problem is certainly not moot inasmuch as the state proposes to proceed with its hearings to determine whether or not TELCO's operations and revenues were substantially disturbed by the strike and whether or not the strikers are entitled to unemployment compensation.
Although there is no certain evidence as to the extent which the hope of receipt of unemployment compensation by the strikers affected the continuation of the strike, nevertheless from the activities of the Union in assisting in mass applications for benefits as well as the Union's characterization of TELCO's opposition to payment of unemployment benefits as manifesting "an anti-union attitude on the part of TELCO", strong inferences could be drawn that the Union at least felt that the receipt of unemployment compensation was of considerable importance in its arsenal of strike weapons.
None of the striking employees has as yet been actually determined to qualify for unemployment benefits because (a) there has as yet been no determination that TELCO's business has been substantially curtailed, i. e., that TELCO had 20% or more decline in revenue (which was indicated as a possibly relevant base in Meadow Gold), nor (b) has there been any actual processing of the strikers' applications to see if any has a per se disqualification under the state act. Assuming, however, that TELCO cannot show that its net revenue was substantially disturbed, then it is clear that almost if not all of the strikers would qualify for unemployment benefits. It therefore follows that the issue of irreparable harm arises because the prospective provision of economic aid to the strikers with a concomitant tax penalty upon the employer could be held to impermissibly and adversely affect the collective bargaining process.

LEGAL ANALYSIS
It is now well settled that state laws may not be used to restrict activities protected by either § 7 or § 8 of the NLRA, 29 U.S.C. §§ 157, 158.[2] The *795 instant problem, however, is one which does not arise out of activities specifically protected or proscribed under those two sections. Hawaii's unemployment laws, like those of the other states, were fostered by the national unemployment insurance legislative policy of the 1930's and were enacted following The Depression. All of the then 48 states enacted such laws in 1936 and 1937. Hawaii's Act was passed in 1939. There was no question that the states intended to be "neutral" in labor disputes.[3]
The notion of state neutrality ignores the realities of state and national governmental intervention in labor relations by means of minimum wage laws, workmen's compensation, the Wagner Act and the Taft-Hartley Act. The federal as well as the state legislative purpose for unemployment pay is "to provide real security against the hazard of unemploymentthe weekly benefits should be sufficient to cover the basic necessities of most claimants and their families without requiring them to resort to relief . . . ."[4] The definition of an unemployed individual in most of the state laws "does not distinguish between the individual who is totally unemployed and without wages, the one who has no regular job, but picks up some work and earnings, and the individual who has not been separated from his regular employment but has had his hours cut and his wages substantially reduced.[5]
As pointed out by Archibald Cox in his Harvard Law Review article on "Labor Law Preemption Revisited":[6]
"An appreciation of the true character of the national labor policy expressed in the NLRA and LMRA indicates that in providing a legal framework for union organization, collective bargaining, and the conduct of labor disputes, Congress struck a balance of protection, prohibition, and laissez faire in respect to union organization, collective bargaining, and labor disputes that would be upset if a state could also enforce statutes or rules of decision resting upon its views concerning accommodation of the same interests."
The basic and ultimate problem before this court is to determine whether or not Hawaii's own Unemployment Compensation Act as interpreted, interferes with the working out of the national policy of encouraging self-organization and collective bargaining without state interference in the use of the economic weapons available to both labor and management.
The factual situation found in both Akahane and Gaspro is not involved here. Each of those cases arose out of an organizational strike. Within a relatively short time in each case the strikers had lost their jobspermanently. The same was not true in Meadow Gold, and, as here also, the strikers knew that sooner or later they would return to their old jobs. Their unemployment was temporary and self-induced.
Times have changed since the 1930's and 1940's and 1950's when the big employers had massive economic muscle, and fractionated unions had little. Today a company union or a purely local union, as a practical matter, no longer exists. Local units are almost uniformly but a segment of a nation-wide union. One no longer talks of the giant employersit is of the giant unions, the IBEW, ILWU, UAW, Teamsters, AFL-CIO. In this local case the IBEW had over 3,300 members out on strike against TELCO.
*796 As in Allen-Bradley v. Board, 315 U.S. 740, 62 S.Ct. 820, 86 L.Ed. 1154 (1942), in the context of this case it is not necessary to treat Hawaii's Unemployment Compensation Act as an inseparable whole. Here the focus is on only one narrow segment of that Act and its interpretation by Hawaii's courts. The sole question is whether the stoppage of work section, supra, as Hawaii has actually treated it, conflicts with the NLRA. Certainly the NLRA was not designed to preclude a state from giving aid to a striker who had actually lost his job, as in Lawrence Baking Co. v. Michigan City, 308 Mich. 198, 13 N.W.2d 260 (1944), and in Akahane and Gaspro. Here, however, TELCO strikers' jobs were not at all terminated; employment was only suspended for the duration of the strike. Both management and Union and its striking members knew that resumption of employment upon the end of the strike would follow "as the day the night."
As said by Justice Frankfurter in dissent in Hill v. Florida, 325 U.S. 538, 552, 65 S.Ct. 1373, 1380, 89 L.Ed. 1782 (1945), in this state-federal conflict "we are in the domain of government and practical affairs" and state action may not be stifled "unless what the State has required, in the light of what Congress has ordered, would truly entail contradictory duties or make actual, not argumentative, inroads on what Congress has commanded or forbidden."
It is in the context of today's realities and "practical affairs" in labor-management collective bargaining which, as this court sees it, has brought out The Court's opinion in Super Tire Engineering Co. v. McCorkle, 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974). There, employers whose plants were struck, brought suit for injunctive and declaratory relief against New Jersey's state policy of holding workers engaged in an economic strike as eligible for public assistance through its welfare program. The employers claimed that the regulations according benefits to striking workers were invalid because they interfered with the federal labor policy of free collective bargaining expressed in the Labor Management Relations Act. Prior thereto, the district court, following the "well-settled law" set forth in ITT Lamp Division v. Minter, 435 F.2d 989 (1st Cir.), cert. denied, 402 U.S. 933, 91 S.Ct. 1526, 28 L.Ed.2d 868 (1971), ruled that the appropriate forum for the problem was Congress and that the New Jersey practice of giving aid to striking workers did not violate the Supremacy Clause. The complaint was then dismissed. On appeal, the court did not reach the merits but remanded the case with instructions to vacate and dismiss for mootness. 469 F.2d 911, 922 (3rd Cir. 1972).
To the surprise certainly of this court, the court stated:
". . . New Jersey has declared positively that able-bodied striking workers who are engaged, individually and collectively, in an economic dispute with their employer are eligible for economic benefits. This policy is fixed and definite. It is not contingent upon executive discretion. Employees know that if they go out on strike, public funds are available. The petitioners' claim is that this eligibility affects the collective-bargaining relationship, both in the context of a live labor dispute when a collective-bargaining agreement is in process of formulation, and in the ongoing collective relationship, so that the economic balance between labor and management, carefully formulated and preserved by Congress in the federal labor statutes, is altered by the State's beneficent policy toward strikers. It cannot be doubted [emphasis added] that the availability of state welfare assistance for striking workers in New Jersey pervades every work stoppage, affects every collective-bargaining agreement, and is a factor lurking in the background of every incipient labor contract. The question, of course, is whether Congress, explicitly or implicitly, has ruled out such assistance *797 in its calculus of laws regulating labor-management disputes. In this sense petitioners allege a colorable claim of injury from an extant and fixed policy directive of the State of New Jersey. That claim deserves a hearing." Super Tire, 416 U.S. 115, 94 S.Ct. 1694, 1699, 40 L.Ed.2d 1 (Footnote omitted.)
What The Court found concerning the pervasive effect of the availability of state welfare assistance during strike-induced work stoppages upon collective bargaining agreements and incipient labor contracts in New Jersey have in this TELCO case been shown as having equal or greater effect. As indicated heretofore, the labor leaders themselves instantly assisted all strikers in filing applications for unemployment compensation and, when this present action was started, condemned TELCO's action as manifesting an anti-union attitude.
Hawaii's requirements here gave to the strikers the expectation of receiving (after the first week) about $280,000 per week for each week the strike continued. TELCO on the other hand was faced with the problem of trying to keep its own business operations from completely collapsing, knowing that if the operations were not ultimately found to have been substantially curtailed, i. e., cut by at least 20%, they would have to pay (after the first week) about $190,000 per week in unemployment tax contributions for each week of the strike. Moreover, such tax "contribution" payments, even if ultimately refunded by the state would be returned without interest![7]

CONCLUSIONS OF LAW
It is in the above "domain of government and practical affairs" that this court must rule upon TELCO's present request for a preliminary injunction.
From the preceding facts and analysis, it appears to this court that, in dollars and cents, TELCO will instantly be faced with the costs of presenting its case to the DLIR on the quantum of business injury it suffered during the strike. From the actions of the DLIR from the outset of the strike, as well as from its February Hawaiian Electric ruling, TELCO has reasonable grounds to believe that the DLIR will find that its operations were not "substantially" impaired and it will be ordered to "contribute" some $832,000 into the state's unemployment fundwith no certainty that that money will be returned (without interest) via rate increase or otherwise.[8]
Guzman's statements to the press clearly show the solid impact of TELCO's present challenge of the state act upon TELCO's labor-management relations.
This court finds that TELCO's showing of threat of irreparable harm, if the requested preliminary restraint is not granted, is sufficient to comply with the first of the four factors involved in preliminary injunction proceedings set forth in King v. Saddleback Junior College, 425 F.2d 426 (9th Cir. 1970), cert. denied, 404 U.S. 979, 92 S.Ct. 342, 30 L.Ed.2d 294 (1971).
As to the second factor, this court finds that the impact of a temporary restraint upon the state in its processing of the strikers' claims and determining TELCO's liability will be almost nil. While the strikers themselves undoubtedly could use the anticipated unemployment *798 compensation, there has developed no inference that any are now on welfare. All have been regularly employed since June 13 (at higher pay), and all may reasonably expect that such employment will certainly continue.
This court's analysis of the legal inferences to be drawn from Super Tire, in the context of what would appear to have been a weaker case than that of TELCO's, induces this court to find TELCO has demonstrated a reasonable probability of success on the merits and so has satisfied the third factor.
There is no question as to the fourth factor. The Court in Super Tire recognized the public interest manifestly involved in labor-management disputes vis-a-vis state assistance to striking workers.
In short, TELCO's case is so closely analogous to Super Tire that this court would feel mandated thereby to state, as did The Court, TELCO's "claim deserves a hearing."

RULING
TELCO's prayer for a preliminary injunction is granted.
TELCO's ability to pay in full for any costs and damages that might be suffered by either the state or the Union cannot be questioned. TELCO's bond, therefor, is fixed in the sum of TEN DOLLARS ($10.00).
TELCO's attorneys will prepare the necessary order.
All counsel will confer, within the next ten (10) days after the filing of the order, upon a schedule for briefing and argument of the underlying question here involved: Whether Congress explicitly or implicitly has ruled out Hawaii's statutory scheme of unemployment assistance in its federal calculus of laws regulating labor-management disputes. A hearing on such scheduling will be held on Friday, July 26, 1974, at 9:00 a. m.
NOTES
[1] As that phrase had been interpreted and applied by the state in Akahane, supra, and expanded in Gaspro, supra, and Meadow Gold, supra.
[2] See Garner v. Teamsters Local 776, 346 U.S. 485, 74 S.Ct. 161, 98 L.Ed. 228 (1953); Building Trades Council v. Kinard Construction Co., 346 U.S. 933, 74 S.Ct. 373, 98 L.Ed. 423 (1954); San Diego Building Trades Council v. Garmon, 359 U.S. 236 (1959); Teamsters Local 20 v. Morton, 377 U.S. 252, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964).
[3] As noted by Shadur in his article on "Unemployment Benefits and the `Labor Dispute'", 17 U.Chi.L.Rev. 294, 296 (1949-50), this view of "neutrality" is notable at least for its age, having been a basis in the 1911 British Act.
[4] Unemployment Insurance Legislative Policy Recommendations for State Legislation 1962, U. S. Department of Labor, Bureau of Employment Security, No. U-212, at 10.
[5] Id. at 9.
[6] 85 Harv.L.Rev. 7, 1352-53 (1972).
[7] HRS Chapter 383-76.
[8] The state's argument that TELCO can suffer no monetary harm because it may charge off increased payments against the rate-making scheme and may get an increase in rates, borders on the frivolous. Not only does TELCO not have any absolute assurance that it will be able to so pass on such expenses to the public, but the argument bypasses the basic legal problem posed and the effect of the decision in this case on employer who, not having a state-controlled monopoly, must opperate under America's free and harshly competitive economic scheme.