LACLEDE GAS COMPANY, Plaintiff-Appellant,

v.

LABOR AND INDUSTRIAL RELATIONS COM. OF MO., The Division of Employment Security, Robert E. Adair, et al., and Thomas B. Bass & William L. Bloom, et al., Claimants, Defendants-Respondents.

Nos. 45348, 45425.

Missouri Court of Appeals, Eastern District, Division Four.

July 12, 1983.

Motion for Rehearing/Transfer to Supreme Court Denied Sept. 15, 1983.

Application to Transfer Denied Oct. 18, 1983.

3. The 1980 will was never executed as the    testatrix died before signing it.

Harold I. Elbert, Thomas J. Frawley, Charles S. Elbert, St. Louis, for Laclede Gas Co.

Timothy P. Duggan, Jefferson City, for Labor & Indus. Relations Comm'n.

Richard Shinners, Laurence J. Lee, St. Louis, for cross-appellant respondent claimants.

Ezra D. Singer, GTE Service Corp., Stamford, Conn., and Robert W. Hedrick, Jr., Jefferson City, for General Telephone Co. of the Midwest.

Stanley E. Craven, Kansas City, for Kansas City Power & Light Co.

Paul G. Lane, Leo E. Eickhoff, Jr., Jack C. Lorenz, St. Louis, for Southwestern Bell Telephone Co.

Arlyn D. Haxton, John A. Vering, III, Kansas City, for United Telephone Co. of Missouri.

SNYDER, Judge.

This court is called upon to determine whether certain striking employees of the Laclede Gas Company (Laclede) were enti-tled to receive unemployment benefits during their strike.[1]

The striking employees were allowed benefits by the Labor and Industrial Relations Commission (Commission). The Commission's decision was affirmed in part and reversed and remanded in part by the St. Louis County Circuit Court and both parties have appealed. The judgment is reversed and remanded.

The decision depends on the resolution of two issues. First: were the strikers unemployed "due to a stoppage of work" which existed because of the labor dispute at Laclede? If a work stoppage existed, the claimants would be ineligible for benefits. See Section 288.040.5 RSMo.1978. Second: were the claimants "available for work" as required by § 288.040.1(2) RSMo.1978? If the claimants were not available for work, they would also be ineligible for benefits.

The striking employees ("claimants") are members of the Oil, Chemical and Atomic Workers International Union (AFL–CIO) Local 5–6 (service workers) and Local 5–194 (clerical workers). A strike was called by the union against Laclede on September 12, 1979; it continued until February 11, 1980 when a new contract was ratified and the claimants returned to work.

During the strike, Laclede continued to supply natural gas to its customers. This was possible partly because Laclede's gas distribution system is largely automated, and partly because 330 of Laclede's 442 non-striking employees were reassigned to do the work of 1,549 strikers in 22 different departments.

The activities of, and services supplied by, the various departments were curtailed anywhere from 10 to 100 percent at the beginning of the strike and 10 to 93 percent at the end of the strike, for an average of 75.4 percent at the beginning of the strike and 69.6 percent at the end.

Planning and budgeting activities were curtailed. Most construction and routine maintenance activities were postponed and

---

1. In this opinion, the writer has borrowed freely without quotation marks from the opening paragraphs and statement of facts of an earlier draft written by Judge Pudlowski.

only emergency repairs were performed. Customers were directed to call independent heating contractors for most installation and repair services. The company closed its appliance and home economics departments. Meters were not read except at customer request. Instead, Laclede prepared estimated bills. The billing and customer accounting functions continued at near-normal levels.

One hundred ten of the striking employees filed claims for unemployment benefits during the strike. Laclede took exception to these claims and filed letters of protest with the Division of Employment Security under the provisions of § 288.070.1 RSMo.1978. The claims were denied by the deputy examiner on the grounds that the claimants were ineligible for benefits under § 288.040.5 RSMo.1978.[2]

The claimants appealed and their claims were consolidated before an appeals tribunal as provided in § 288.190.2 RSMo.1978. The parties stipulated that the claimants unemployment was due to a labor dispute which existed at the premises where they were last employed, and that all of the claimants either participated in or financed or were directly interested in the dispute.

An evidentiary hearing was held before the appeals tribunal.[3] At the outset of the hearing, counsel for the employer raised the issue of availability. This issue had not been addressed in the deputy's determination. Laclede suggested that because the claimants continued to be employees of Laclede while on strike, they could not be "available for work" as required by § 288.-040.1(2) RSMo.1978. Laclede suggested further that several claimants had been members of the union's negotiating committee and were unavailable by reason of their union activities. The appeals tribunal ruled that the issue of availability was not before it, and refused to hear any evidence on that issue. The parties proceeded to the issue of whether a "stoppage of work" had occurred at Laclede.

The claimants' evidence focused on the fact that Laclede continued to distribute gas normally and was able to respond to all emergencies during the strike. Some subcontracting was used to assist in essential construction and equipment maintenance. Nonessential construction, appliance service, installations, and gas conversions were not performed; instead, customers were referred to independent heating contractors. Although few meters were read during the strike, Laclede sent customers estimated bills and continued to receive normal revenues from its gas distribution activities. Customer accounts were kept up to date and data processing activities continued at a near-normal level.

Laclede's evidence stressed the widespread changes in operating methods which it had instituted in order to keep the gas distribution system going. Managers were forced to curtail budgeting, financial analysis, and long range planning activities; supervisors did the work of the people they usually supervised. Witnesses for Laclede described the effect of the strike on each of Laclede's 22 operating departments. They

2. Section 288.040.5 reads:
   (1) A claimant shall be ineligible for waiting week credit or benefits for any week for which the deputy finds that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute in the factory, establishment or other premises in which he is or was last employed. . . .
        *    *    *    *    *    *
   provided . . . that this subsection shall not apply if it is shown to the satisfaction of the deputy that
     (a) He is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work, and
     (b) He does not belong to a grade or class of workers of which, immediately preceding the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute.
   (2) "Stoppage of work" as used in this subsection means a *substantial* diminution of the *activities, production or services* at the establishment, plant, factory or premises of the employing unit. (Emphasis added).

3. The record of this proceeding is the record upon which all further appeals—before the Commission, the circuit court, and this court—have been based.

estimated that operations of the various departments were curtailed anywhere from 10 to 100 percent at the beginning of the strike and 10 to 93 percent at the end of the strike, for an average curtailment of 75.4 percent at the beginning of the strike and 69.6 percent at the end. These figures were arrived at by "approximation" and were based on various measurements of "normal" activity, for example, the number of meters installed or read, or the number of telephone calls answered, or appliances sold, in past years.

Based on this testimony, the appeals tribunal concluded that a stoppage of work had in fact occurred, so that the claimants were ineligible for benefits. The claimants then filed an application for review by the Labor and Industrial Relations Commission.

The Commission reversed the decision of the appeals tribunal, stating that: "In evaluating the effect of the labor dispute on the employer's operations, courts have emphasized the aspect of production, or the final product or set of products, or the ultimate purpose of the employer's operations." (citations omitted). Evaluating the evidence in light of this standard, the Commission, with one member dissenting, concluded that no stoppage of work had occurred because Laclede was able to deliver gas to its customers during the strike. The Commission further ruled that the claimants were not rendered unavailable for work simply because they were engaged in a strike.

Laclede appealed the Commission's decision to the circuit court of St. Louis County as provided by § 288.210 RSMo.1978. Laclede contended, first, that the Commission had improperly construed and applied the statute by looking exclusively at the level of production in determining whether a stoppage of work existed; second, that the Commission's finding that no stoppage of work existed was not supported by substantial evidence; and third, that the Commission had erred in finding the claimants to

be available for work, and in failing to remand the matter to the appeals tribunal for an evidentiary hearing on the issue of availability.

The circuit court affirmed the Commission's decision on the issue of work stoppage, finding it to be supported by substantial evidence. The court reversed and remanded on the issue of availability of work, holding that the Commission had erred in ruling on this question before hearing any evidence on the matter.

Laclede filed its notice of appeal to this court. It contends that the circuit court erred in affirming the Commission's finding on the "stoppage of work" issue, because the Commission misread the statutory definition of a "stoppage of work" and further because its decision was not supported by substantial evidence. In addition, Laclede asserts that the circuit court erred in remanding the availability issue to the Commission. Laclede argues that the claimants were not available for other work because they clearly intended to continue their employment with Laclede during and after the strike; therefore, Laclede says, the Commission's decision on availability should have been reversed outright.

The claimants cross-appealed, maintaining that the circuit court should have affirmed the Commission's decision on *both* the stoppage of work and availability issues.[4]

In the proceedings before the Commission, the claimants had the burden of proving that they were eligible for benefits. *Producers Produce Co. v. Industrial Commission,* 365 Mo. 996, 291 S.W.2d 166, 173[2, 3] (1956). The claimants were eligible for benefits only if the Commission found that the requirements of the statute had been met. *Id.*

■ On these appeals from the judgment of the circuit court, this court reviews the decision of the Commission, and not that of the circuit court. *Division of Employment*

---

**4.** Amicus curiae briefs were filed by General Telephone Company of the Midwest, Kansas City Power and Light Company, Southwestern Bell Telephone Company and United Telephone Company of Missouri. The Commission submitted briefs in response to both the briefs of appellant and amici curiae and the brief of claimants as cross-appellants.

*Security v. Labor and Industrial Relations Commission,* 625 S.W.2d 882, 884[1] (Mo. App.1981).

■ The first issue is whether the Commission's decision presents to this court a question of fact or a question of law. Determinations by the Commission of questions of law are not binding on a reviewing court; appellate review of factual determinations by the Commission is limited to ascertaining whether, on the record as a whole, the decision is supported by competent and substantial evidence. See *Division of Employment Security v. Labor and Industrial Relations Commission,* 617 S.W.2d 620, 621–622 (Mo.App.1981). Because the facts are undisputed, the question this court must decide is not whether the Commission's decision is supported by competent and substantial evidence, but whether the Commission properly applied the law to the facts before them.

No one questions the fact that 1,549 of Laclede's employees went out on strike, leaving 442 non-striking employees. No one questions the fact that the activities of Laclede's various departments were curtailed an average of 75.4 percent at the beginning of the strike and 69.6 percent at the end. And no one questions the fact that Laclede continued to supply natural gas to its customers during the strike. These are the facts as found by the Commission and the Commission's decision indicated no dispute concerning any fact matter.

Whether a question of fact or a question of law is presented hinges in part upon the reasoning followed by the Commission in reaching its decision. The Commission held in part: "The Commission finds here that no work stoppage existed because the evidence shows that the company curtailed most management activities while providing its product[5] to its customers as usual." Thus, the Commission found as a matter of law that if production is maintained, there

is no stoppage of work even though most management activities were curtailed.

The Commission relied solely on the factor of production. And yet, in its decision, before it concluded there was no stoppage of work, the Commission said: "If the strike did not have a substantial impact upon the ability of the employer in this case to serve its customers by providing normal delivery of its product, then the State will not lend strength to the position of the strikers by allowing unemployment compensation." The statement is an interpretation of policy which is obviously inconsistent with the conclusion finally reached by the Commission.

■ Only the legal significance of the strike is at issue; i.e., the only question is whether, considering the facts as found by the Commission, the strike constituted a stoppage of work because of a labor dispute within the meaning of § 288.040.5 RSMo. 1978. If the only issue is whether the facts of a particular case fall within the meaning of a statute, that issue is a question of law. See *Haynes v. Unemployment Compensation Commission,* 353 Mo. 540, 183 S.W.2d 77, 80[3] (1944); *Fruehauf Division, Fruehauf Corp. v. Armstrong,* 620 S.W.2d 67, 68[3, 4] (Mo.App.1981) (whether acts constituted "misconduct connected with his work" under § 288.050.2 RSMo.1978 is a question of law); *First Bank of Commerce v. Labor and Industrial Relations Commission,* 612 S.W.2d 39, 42[2, 3] (Mo.App.1981); See also *Cumberland and Allegheny Gas Co. v. Hatcher,* 147 W.Va. 630, 130 S.E.2d 115, 123[7–9] (1963) overruled in part in *Lee-Norse Co. v. Rutledge,* 291 S.E.2d 477, 484[3] (W.Va.1982). Whether claimants were unemployed due to a stoppage of work is therefore a question of law.

"A claimant shall be ineligible for ... benefits for any week for which ... his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute ..." § 288.040.5 RSMo.1978.

5. Laclede points out in its brief that it does not actually produce natural gas. It purchases the gas from suppliers and distributes it through its pipeline system. The parties have nevertheless continued to use the term "production" when referring to the distribution function and this court follows that usage in this opinion.

The parties have stipulated that claimants were unemployed because of a labor dispute. The issue thus narrows to whether claimants' unemployment was due to a stoppage of work under the statute. The Commission interpreted and applied the statute to an undisputed factual situation. This court holds that there was a stoppage of work due to a labor dispute and reverses that part of the judgment which ruled that there was no stoppage of work.

■ The issue is whether an employer which is able to maintain prestrike levels of production but which must reduce, postpone or eliminate the activities of nearly all other departments has suffered "a substantial diminution of its activities, production or services." For two reasons this court holds that the Commission erroneously applied the law when it placed sole emphasis on the fact that an employer has been able to maintain delivery of final product in the face of a strike in determining whether there was a stoppage of work. First, Missouri's statutory definition of "stoppage of work" specifically declares a substantial diminution of activities, production or services, in the disjunctive, to be a stoppage of work. The curtailment of most management activities must be given equal weight with production under the statute. Second, even without Missouri's statutory definition, under the substantial curtailment of operations test applied by other jurisdictions, the better reasoning is that delivery of final product is not the sole determinate of a stoppage of work. The Commission evaluated the facts by the wrong standard.

Missouri is apparently the only state which has a detailed statutory definition of "stoppage of work." See Lewis, Willard A., *"The 'Stoppage of Work' Concept in Labor Dispute Disqualification Jurisprudence,"* 45 J.Urb.L. 319, 327 fn. 30 (1967). Section 288.040.5(2) RSMo.1978 defines a stoppage of work as "... a substantial diminution of the activities, production *or* services at the

establishment, plant, factory, or premises of the employment unit." (Emphasis added).

■ In construing a statute a court's primary duty is to give effect to legislative intent as expressed in the words of the statute and to consider the words used in their plain and ordinary meaning. *City of Willow Springs v. Missouri State Librarian,* 596 S.W.2d 441, 445[4–6] (Mo. banc 1980). A legislature is also presumed to intend the passage of an effective law and to make some change in the existing law. *In re Tompkins' Estate,* 341 S.W.2d 866, 872[8] (Mo.1960).

■ The Missouri employment security act became effective in 1937. Laws 1937 page 574, § 1; § 9421 RSMo.1939. It disqualified for benefits claimants who were unemployed because of a stoppage of work arising out of a labor dispute. It did not define stoppage of work. § 9431 II (a) RSMo.1939. In 1941 the law was amended to include the current definition of "stoppage of work." Laws 1941, page 576, § 2, page 584; (§§ 288.020.13, 288.120.2(1) RSMo.1949).

The Missouri legislature recognized that production was not the major criterion when it defined a stoppage of work as a substantial diminution in activities, production or services. By the amendment the legislature intended to limit the Commission's discretion in determining when there is a stoppage of work that disqualifies claimants from benefits.

Activities, production and services are broad terms which reflect legislative intent that the full range of activities and services normally performed by the employer, not just production, must be considered in determining whether there is a stoppage of work.

Since the 1941 amendment, the employment security act has been amended at least twelve times.[6] Each time the same detailed definition of "stoppage of work"

---

6. Laws 1947, vol. II, p. 389 § 2; Laws 1951 p. 564 § 1; Laws 1957 p. 531; Laws 1965 p. 420 § 1; Laws 1967 p. 395 § 1; Laws 1969 p. 397; Laws 1971–72 p. 900 § 1; Laws 1971–72 p. 921 § 1; Laws 1975–76 p. 302 § 1; Laws 1977 p. 467 § 1; Laws 1978 p. 588 § 1; Laws 1982 p. 494 § 1.

was re-enacted. The legislature has had ample opportunity to revise the definition and has not done so. If the legislature had intended to adopt the judicial definition which is the law in a large number of jurisdictions, cases from two of which were relied on by the Commission in its decision, it would not have consistently re-enacted § 288.040.5(2). The statute requires the Commission to find there is no substantial diminution in any of the three factors before a finding can be made that no stoppage of work exists.

■ "Or", in its plain and ordinary meaning, denotes a "choice between alternative things, states or courses . . ." Webster's Third New International Dictionary 1586, 1(2) (unabridged 1976).[7] The legislature intended the passage of a law which would limit the discretion of the Commission when it was necessary for the Commission to decide when a stoppage of work occurred. The Commission must consider each of the three factors: activities, production and services. It did not do so. It found as a fact that there was a diminution of activities and services but based its ruling that there was no stoppage of work under the statute upon the fact that Laclede continued to serve its customers.

The only functions which continued at a normal level during the strike were the distribution of natural gas and the billing of customers. Managers were forced to curtail budgeting, construction, routine maintenance and repair, and long range planning activities; the company closed its appliance and home economics departments and customers were directed to call independent contractors for most installation and repair services; most meters were not read; supervisors did the work of the striking employees.

As a result of the strike there was a backlog of demand for installation of remote indexes, meter changes, construction of mains and for other such activities, production and services. Laclede was required to hire additional temporary personnel and work employees overtime to eliminate this backlog.

Laclede suffered an almost total loss of its appliance service revenue during the strike. The company grossed $1,004,254 from appliance service the year before in October, November and December of 1978 and January of 1979. It grossed only $6,197 during the comparable four full months of the strike in 1979 and 1980. The loss can never be recovered.

Three hundred thirty of the employer's non-union workers were assigned to do the work of union employees in 22 different departments. In September, 1979, the activities in those departments were curtailed in various percentages ranging from 10 percent to 100 percent. The overall average curtailment was 75.4 percent during September 1979 and 69.6 percent in February 1980.[8] The normal activities of the non-union employees who were transferred to union jobs were abandoned or seriously cur-

---

7. One Missouri case, *Hawkins v. Hawkins,* 511 S.W.2d 811, 813[2] (Mo.1974) holds that the legislature inadvertently used the word "or" when it referred to " . . . alimony in gross or from year to year . . ." Section 452.080 RSMo. 1978; that the legislature meant "and/or", § 452.080 RSMo.1969; and that the court could decree alimony in gross and also from year to year in the same case. The case does not aid claimants. There was no inadvertence here. The legislature has re-enacted the present definition of "stoppage of work" at least twelve times since 1941. Moreover, even following the *Hawkins* inclusive use of "or" here would mean there was a stoppage of work if there was a substantial diminution in either activities or services or production, or any combination of the factors.

8. The departments and the percent their activities and services were curtailed at the end of the strike were: Service and Installation—60%, Meter Department—70%, Building Service—80%, Construction and Maintenance—82%, Gas Supply and Control—46%, Distribution Clerical—90%, Transportation Department—65–75%, Meter Reading Department—93%, Materials & Supplies—80%, Cashiers & Mailing—10%, Printing Department—85%, Customer Relations—50%, Collection and Credit—70%, Customer Accounting—50%, Sales—80%, Data Processing—10%, Purchasing—50%, General Accounting—40%, Payroll—80%, Engineering and Drafting—85%, Laboratory—60% and St. Charles Clerical—25%.

tailed. These are the facts as determined by the Commission. To say that there was not a substantial diminution of activities and services in the fact of these factual findings would be to ignore reality.

■ The substantial diminution of activities and services constitutes a stoppage of work under the unique definition of that phrase in § 288.040.5(2) RSMo.1978.

The courts which have refused to rely solely on a company's production level in determining whether a work stoppage occurred have recognized the need to consider a company's overall operations.

"Since the mid-fifties, there has been a new emphasis placed upon the term 'operations.' As production increasingly represents less than totality of the employing unit's performance, the decreases in business revenue, services rendered, marketing, research, and maintenance, transportation and construction activities have come to the fore as indicia of substantialness."

Lewis, *The "Stoppage of Work" Concept in Labor Dispute Disqualification Jurisprudence, supra* at 332.

■ By deciding that the existence of normal production meant there was no stoppage of work, the Commission excluded from its consideration the statutory factors of activities and services. In effect, the Commission held that diminution of production must be present in order to constitute a stoppage of work, a holding which patently ignores the plain language of the statute. It was an erroneous application of the law.

Reversal is also supported by the cases from other jurisdictions. Most states disqualify a claimant for unemployment bene-

fits if the claimant is unemployed due to a stoppage of work caused by a labor dispute. Lewis, *The "Stoppage of Work" Concept in Labor Dispute Disqualification Jurisprudence, supra* at 319. Unlike Missouri, however, the other states' legislatures have not defined stoppage of work. The judicial definition employed generally in these other states is that a stoppage of work exists if there is a substantial curtailment of the employer's normal operations.[9]

In an Indiana case which is remarkably similar to the case under review, it was held that, although a public utility was able to maintain normal distribution of gas and electrical energy to its customers by maintaining a skeleton work force consisting of non-union personnel, a stoppage of work existed so as to disqualify the striking employees from receiving unemployment benefits. *Aaron v. Review Board of Indiana Employment Security Division,* 440 N.E.2d 1, 3 (Ind.App.1982).

The Indiana court said: "Even though Pierce Governor was able to resume production, normal operations contemplate something more than production. (citations omitted) The business operations must substantially conform to the standard or regular operations of the plant. If the labor dispute interferes with the normal plan of operations, this disqualification is applicable." *Aaron v. Review Board, supra* at 3, quoting with approval *Pierce Governor Company v. Review Board of Indiana Employment Security Division,* 426 N.E.2d 700, 704[9] (Ind.App.1981).

The better view as expressed in *Aaron v. Review Board, supra,* is that whether the entire operation of the employer has re-

**9.** See, e.g., *Monsanto Chemical Co. v. Thornbrough,* 229 Ark. 362, 314 S.W.2d 493, 496[6] (1958); *Ahnne v. Dept. of Labor and Industrial Relations,* 53 Haw. 185, 489 P.2d 1397, 1400[1] (1971); *Travis v. Grabiec,* 52 Ill.2d 175, 287 N.E.2d 468, 470 (1972); *Aaron v. Review Board of Indiana Employment Security Division,* 440 N.E.2d 1, 3 (Ind.App.1982); *Employment Sec. Administration v. Browning-Ferris, Inc.,* 292 Md. 515, 438 A.2d 1356, 1362[1] (1982); *Westinghouse Broadcasting Co., Inc. v. Director of Div. of Employment Sec.,* 378 Mass. 51, 389 N.E.2d 410, 412[1] (1979); *Continental Oil Co.*

*v. Board of Labor Appeals,* 178 Mont. 143, 582 P.2d 1236, 1243[8, 9] (1978); *Magner v. Kinney,* 141 Neb. 122, 2 N.W.2d 689, 692[3] (1942); *Gerber v. Board of Review,* 36 N.J.Super. 322, 332, 115 A.2d 575, 578[2, 3] (A.D.1955); *Albuquerque—Phoenix Express, Inc. v. Employment Sec. Commission,* 88 N.M. 596, 544 P.2d 1161, 1166[6] (1975); *Trapeni v. Dept. of Employment Sec.,* 142 Vt. 317, 455 A.2d 329, 332 (1982); *Shell Oil Co. v. Brooks,* 88 Wash.2d 909, 567 P.2d 1132, 1134[2] (banc 1977); *Cumberland and Allegheny Gas Co. v. Hatcher, supra,* 130 S.E.2d at 120[3, 4].

turned to normal is the deciding issue. Upon the facts found by the Commission, Laclede did not carry on a normal operation during the strike. Many functions are necessary to sustain production on a long term basis for a large scale employer; therefore, focussing solely on an employer's final output grossly distorts the view of the operations of a business.

There is also persuasive reasoning supporting the proposition that the employer's final output should not be the controlling factor in determining whether a stoppage of work occurred in *Travis v. Grabiec*, 52 Ill.2d 175, 287 N.E.2d 468, 470 (1972), in which the court said:

> We are ... of the opinion that the position taken by the trial court, which looks only at gross production without regard to the means by which that production is achieved or the continuing disruption of the normal operating methods of the employer, does not reflect the intention of the legislature. Since there is no single pattern or mold which can confine all aspects of all of the varied types of industrial and commercial enterprises and all of the labor disputes in which they and their employees may become involved, it is not surprising that it is difficult to capture all of the variables in a single word or phrase. It may be that there are some situations in which normal operations can be measured accurately enough in terms of gross production. But there are other situations in which a myopic concern with production to the exclusion of the consideration of all other aspects of the enterprise can result in gross distortion.

The Illinois Supreme Court found the striking claimants ineligible for benefits and reversed the judgments of the circuit court and the court of appeals.

The court in *Travis v. Grabiec, supra,* also noted an irony often present in the position of strikers who assert that they are eligible for unemployment benefits because the labor dispute did not result in a substantial reduction in the employer's operations:

> '[W]hen the employer regained production to a point where business operations are substantially normal, then stoppage of work ends. Normal operations would mean that conforming to the standard, or regular operation of the employer's plant. Even though for a period of time full production was carried on by a skeleton force working abnormal hours and performing abnormal functions, this certainly could not mean normal operation. To hold otherwise, would require this Court to say that the employer did not need the 2,070 employees, or need the existing facilities that were not being used, nor to maintain or replace its equipment. The Court is of the opinion that 'stoppage of work' ends when the employer's business operations returns to substantially normal operations.'

270 N.E.2d at 471–472.

The application of the Illinois court's reasoning to the case under review is obvious. This court cannot say Laclede's operations were normal during the strike or that in normal operation the company could dispense with the 1,549 striking workers.[10]

Cases from the states of Washington and Arizona also support the finding that there was a stoppage of work during the Laclede strike. In *Acheson v. Employment Security Department,* 19 Wash.App. 915, 579 P.2d 953, 956[2] (1978) benefits were denied employees of a gas utility who did not work during a strike. The employees in question were not strikers but were members of non-striking unions. The Washington Court of Appeals held that there had been a stoppage of work. In determining whether there was a stoppage of work the court used the substantial curtailment of the employer's overall operations test. It held that a number of factors should be assessed,

---

**10.** In Great Britain the decisions on the question of stoppage of work turn on the number of job vacancies. Practically all the courts in the United States have rejected this restrictive construction for a rule which takes into considera-

tion all factors affecting the operations of the employer's business. *Mountain State Tel. & Tel. Company v. Sakrison,* 71 Ariz. 219, 225 P.2d 707, 711 (1950).

including the decrease in production, business revenue, services rendered, marketing research, maintenance, transportation and construction activities, as indicia of the extent of the curtailment of work.

Benefits to striking employees were also denied in *Mountain States Tel. & Tel. Company v. Sakrison,* 71 Ariz. 219, 225 P.2d 707 (1950). The Arizona Supreme Court held that a strike resulted in a stoppage of work and construed that phrase as used in their statute as a substantial curtailment of operations. 225 P.2d at 711. As in the case under review, the Commission allowed benefits. The Supreme Court of Arizona reversed the decision, saying that it was unfortunate that the legislature had given the court no aid in construing the meaning of the term "stoppage of work." The court went on to find that there was a substantial curtailment of operations because of declines in revenue and services.

The substantial curtailment of operations test, which is applied by other jurisdictions, see note 9, *supra,* lumps all three factors together and requires a look at the employer's business as a whole. Even by that standard there was a stoppage of work during the Laclede strike. See *Travis v. Grabiec, supra; Aaron v. Review Board, supra.* The restrictive definition adopted by the Missouri legislature mandates even more strongly that a stoppage of work indeed existed here because of the undisputed substantial diminution of Laclede's activities and services.

The Commission, in support of its decision, cites cases from other jurisdictions which have emphasized the aspect of production or the ultimate purpose of the employer's operation. *Continental Oil Company v. Board of Labor Appeals,* 178 Mont. 143, 582 P.2d 1236 (1978); *Meadow-Gold Dairies—Hawaii, Ltd. v. Wiig,* 50 Haw. 225, 437 P.2d 317 (1968); *Cumberland and Allegheny Gas Co. v. Hatcher,* 147 W.Va. 630, 130 S.E.2d 115, 123[7–9] (1963); *Monsanto Chemical Co. v. Thornbrough,* 229 Ark. 362, 314 S.W.2d 493 (1958).

The Commission then finds that two of these cases are factually similar, *Continen-*

*tal Oil Company v. Board of Labor Appeals, supra* and *Cumberland and Allegheny Gas Co. v. Hatcher, supra.* Indeed, it was held in both cases that although there was a curtailment of management activities, the company was able to provide its product to its customers and therefore there was no stoppage of work under the law of the state. They measured substantial curtailment of operations in terms of final production. The cases are not binding on this court.

*Continental* can be distinguished factually because in *Continental* supervisors were imported from other areas to replace the strikers.

The controlling distinguishing factor, however, is the absence of any statutory definition of "stoppage of work" in West Virginia and Montana.

The reasoning in *Aaron v. Review Board, supra* and *Travis v. Grabiec, supra* is preferred. In both cases the courts found that a stoppage of work due to a labor dispute existed under facts similar to those which are present here. The claimants position in oral argument was that even if 100% of Laclede's activities and services other than delivery of gas were curtailed, the court should nonetheless find that no stoppage of work occurred. This is not the law.

■ Public policy must necessarily enter into any court decision relating to unemployment benefits. The parties and amici curiae agree that the state must preserve a neutral position in labor disputes, but they disagree on how that neutrality should be defined.

The cases in Missouri hold that the state should not aid strikers.

Section 288.040, subd. 4(1), which withdraws the benefits of the Act from those whose unemployment is due to a stoppage of work existing because of a labor dispute in the factory, establishment or other premises in which he is last employed, constitutes a legislative affirmation of the public policy that the state shall preserve a neutral position in labor disputes; a legislative recognition of the essential injustice of forcing an employer to assist

in the financing of employees with whom the employer is engaged in a labor dispute, by requiring the payment of unemployment compensation benefits during a work stoppage.

*O'Dell v. Division of Employment Security,* 376 S.W.2d 137, 142[6] (Mo.1964); see also, *Huck v. Industrial Commission,* 361 S.W.2d 332, 336 (Mo.App.1962); *Meyer v. Industrial Commission of Missouri,* 240 Mo.App. 1022, 223 S.W.2d 835, 838[1] (1949).

Cases in other states express similar views. " . . . [I]t would be unfair to use funds built up by labor and management jointly to support labor in a contest wherein it was exerting economic pressure against management by striking." *Olof Nelson Construction Company v. Industrial Commission,* 121 Utah 525, 243 P.2d 951, 960 (1952).

The policy requiring state neutrality in labor disputes should be considered even more carefully when public utilities are involved because the law declares that the services provided by utilities are life essentials of the people and that labor strife in utilities is a threat to the welfare and health of the people. § 295.010 RSMo.1978.

■ The state should not afford economic assistance to one of the parties in a labor dispute at the expense of the other. When the state requires the employer to continue paying wages to striking employees through the medium of unemployment benefits, it abandons its neutrality and casts its lot with one party to the dispute. A payment of tax free unemployment compensation benefits to striking employees strengthens their relative bargaining position.

■ The employment security act was intended to help workers who are unemployed through no fault of their own. The average citizen would be astonished to learn that those who voluntarily strike could be entitled to collect unemployment compensation under any circumstances. Under the law benefits may be paid to strikers but only if there is no stoppage of work as defined by the statute. § 288.040.5 RSMo. 1978.

The right to strike is indeed inviolable, but the right carries with it the acceptance of whatever consequences may follow. The legislature attempted to define those consequences in its definition of "stoppage of work."

To affirm the Commission's decision allowing benefits to the Laclede strikers in this case would be to permit the abandonment of the neutrality position of the state and place it instead on the side of the strikers. To affirm the decision would assure that virtually any striking employee of a public utility would be eligible for unemployment benefits. This is not the policy in Missouri. *O'Dell v. Division of Employment Security, supra.*

Claimants argue that withholding unemployment benefits violates state neutrality by placing the state on the side of the employer. Not so. Being neutral means " . . . not siding with or assisting either of two or more contending parties . . . " Webster's Third New International Dictionary 1521, 1a (unabridged 1976). Payment of the benefits obviously would assist the strikers in the labor dispute.

In effect, what the claimants are saying is that because Laclede continued to supply gas, the strikers' bargaining power was unequal, and therefore their bargaining power should be strengthened by payment of the benefits. Claimants are confusing equality of bargaining power with neutrality. They are asking the state to give the strikers greater bargaining power by paying the benefits instead of remaining neutral by letting the employer and striking employees fight their economic battle without state intervention. This is a strained interpretation of neutrality.

Throughout the history of the employment security act, benefits have been increased in amount, and the circumstances under which benefits are payable have been enlarged. This is another case in which employees understandably attempt to extend the unemployment circumstances un-

der which employees are entitled to benefits.

The increases in the amounts of the unemployment benefits and the expansion of the members of employees who are eligible along with distressed economic conditions, have resulted in a threat to the very solvency of the employment security fund. The State of Missouri is at this time indebted to the federal government for an amount in excess of $136,000,000 which had to be borrowed to maintain the fund's solvency. The money must be repaid ultimately by ordinary taxpayers. The system should not be further endangered by an expansion of eligibility in the face of a plain legislative direction which here mandates a finding that there was indeed a statutory "stoppage of work."

The parties have also raised the issue of whether claimants were "available for work" as required by § 288.040.1(2) RSMo. 1978. Inasmuch as the claimants are ineligible for unemployment benefits because there was a stoppage of work at Laclede due to a labor dispute, it is unnecessary to resolve the availability for work issue.

The judgment of the circuit court is reversed and the cause remanded to the circuit court for entry of judgment in favor of appellant Laclede Gas Company.

KELLY, J., concurs.

PUDLOWSKI, P.J., dissents with opinion.

PUDLOWSKI, Judge, dissent.

I respectfully dissent. I believe that the question of whether a "stoppage of work" existed was a question of fact, and that the Commission's decision on this factual issue was supported by competent and substantial evidence.

The majority asserts that the facts were "undisputed" and that "the Commission's decision indicated no dispute concerning any fact matter." I cannot agree. The existence *vel non* of a stoppage of work is universally regarded as a factual question, the resolution of which depends on the facts and circumstances of each case. See cases cited in Annot., 61 A.L.R.3d 693; Lewis,

"The 'Stoppage of Work' Concept in Labor Dispute Disqualification Jurisprudence," 45 U.Det.J.Urb.L. 319, 321–322 (1967) (hereinafter "Lewis"). The parties to this case stipulated *only* that the claimant's unemployment was "due to a labor dispute" and that all of the claimants were either participating in or financing or directly interested in the dispute. They did not agree on the ultimate factual issue of whether a stoppage of work existed. At the evidentiary hearing before the appeals tribunal, both parties introduced statistics and oral testimony detailing the extent to which the strike had affected normal activities, production, and services at Laclede. The claimant's evidence tended to show that the effect had been minimal; Laclede's evidence tended to show that it had been substantial. The Commission's decision recognized and was based upon the existence of a factual dispute. After reviewing the stipulations and some of the evidence presented, it observed that "[t]he only factual issue to be decided in this matter is whether or not a stoppage of work existed during the period September 12, 1979 through February 10, 1980." It went on to hold that no work stoppage existed.

The Commission's decision can be reviewed as a matter of law *only* if the facts were not in dispute. "If ... ultimate facts or factual inference exist to which the parties have *not* stipulated, the court reviews conceded facts in a light most favorable to the respondent and disregards inferences favorable to the appellant." (Emphasis added). *McHenry v. Claspill*, 545 S.W.2d 690, 693 (Mo.App.1976); *Adams v. White*, 488 S.W.2d 289, 298 (Mo.App.1972); *Semo Motor Co. v. National Mutual Insurance Co.*, 383 S.W.2d 158, 161 (Mo.App.1964). "The court may not substitute its judgment on the evidence and may not set aside an administrative decision unless the decision is contrary to the overwhelming weight of the evidence. [Citing cases] .... If evidence before an administrative body would warrant either of two opposed findings, the reviewing court is bound by the administrative determination, and it is irrelevant that

there is supportive evidence for the contrary finding. [Citing cases.]" *Pulitzer Publishing Co. v. Labor and Industrial Relations Commission,* 596 S.W.2d 413, 417 (Mo. banc 1980). I believe that the Commission, after reviewing the whole record, could reasonably have determined that no stoppage of work existed.

The majority gives great significance to the evidence that activities in Laclede's 22 departments "were curtailed in various percentages ranging from 10 per cent to 100 per cent," averaging between 75.4 per cent at the beginning of the strike and 69.6 per cent at the end. Detailed figures for various departments are quoted in footnote 8 of the majority's opinion. The majority asserts that "these are the facts determined by the Commission," and that "no one question[ed]" them on this appeal. The record, I believe, does not support these assertions. The figures quoted by the majority are derived from Laclede's Exhibit "A," introduced in the hearing before the appeals tribunal. The claimants attempted to impeach the testimony of a witness who helped to prepare the exhibit for Laclede. The witness, on cross-examination, explained that the figures were arrived at by "approximation" and by comparison with what company officers "assumed" would have been done otherwise. The exhibit was based in part on company records, but was prepared specifically for purposes of litigation. The exhibit on its face discloses that the 75.4 per cent and 69.6 per cent "total" curtailment figures were arrived at by simply averaging together the approximated figures from each of the 22 departments listed. No effort was made to evaluate or weigh these figures according to the relative size or importance of each department, based on their respective contributions to revenue or profit, their relative payroll or overhead costs, distinctions between legally required activities and optional ones, or any other such factors. For example, an asserted 90% reduction in the printing department, which employed 5 union employees, was given equal weight with the 90% reduction in the construction and maintenance department, which included 502 union em-

ployees. The percentages reported did not take into account subcontracting of work in the construction and maintenance, transportation, receiving, printing and data processing departments. No consideration was given to the fact that gas distribution and the company's revenue stream were uninterrupted during the strike. I am unable to characterize statistics of this type as "undisputed facts." The record as a whole clearly discloses that the claimants vigorously disputed the validity and significance of Laclede's statistics in relation to the ultimate issue of whether a stoppage of work existed.

It was the function of the Commission to weigh the evidence and assess the credibility of witnesses. *John Epple Constr. Co. v. Labor & Industrial Relations Commission,* 647 S.W.2d 926 (Mo.App.1983). It could choose to believe all or none of any witness' testimony, *Doerer v. Labor & Industrial Relations Commission,* 617 S.W.2d 501, 504 (Mo.App.1981), and was not required to accept all of the evidence presented by Laclede even though there was no direct testimony in opposition to that evidence. *Chemtech Industries, Inc. v. Labor & Industrial Relation Comm'n,* 617 S.W.2d 121, 124 (Mo.App.1981). So long as two different conclusions or inferences could be drawn as to the ultimate fact in issue, the question did not become one of law. *Cross v. Industrial Commission,* 359 S.W.2d 494, 500 (Mo. App.1962). Although Laclede asserts that it maintained only "bare bones" operations during the strike, a careful review of the evidence discloses that the Commission could reasonably have found a good deal of muscle on those bones. The heart of Laclede's business—gas service to customers— was maintained; all emergencies were taken care of; data processing activities continued at 90% of normal levels; revenue from customers continued to flow in at the same time that significant wage expenses were being saved due to the strike. The Commission recognized that some of Laclede's "activities" were curtailed but ultimately concluded that those activities did not amount to a substantial curtailment of

Laclede's overall operations. Regardless of what this court thinks of that conclusion, I believe that it was a factual decision, that it was supported by substantial evidence, and that we are bound to affirm it.

A careful reading of the Commission's decision also discloses that the Commission did *not* place "sole emphasis" on the factor of production contrary to the mandate of § 288.040.5(2) RSMo 1978. The four cases cited by the Commission in support of its decision are clearly and explicitly based upon an examination of the employer's *overall operations. Tri-State Motor Transit Co. v. Industrial Commission,* 509 S.W.2d 217 (Mo.App.1974), applied § 288.040.5(2) by examining such factors as the number of employees working, the amount of business being handled, and gross revenues. *Id.* at 223–225. The court in *Tri-State* recognized that "courts tend to concentrate on the diminution of the activities of production in determining the question of existence of a stoppage of work," *Id.* at 225, but clearly understood that production was only one aspect of the statutory standard. *Continental Oil Co. v. Board of Labor Appeals,* 178 Mont. 143, 582 P.2d 1236 (1978), also recognized that it was necessary to consider all the "facts and circumstances of each case" in determining whether the employer's "business operations are substantially normal." *Id.* at 1243, 1244. It concluded that given the nature of the business of the particular employer involved in that case, production was the "first and major measure" to be considered—but certainly not the only measure. *Id. Meadow-Gold Dairies— Hawaii, Ltd. v. Wiig,* 50 Haw. 225, 437 P.2d 317 (1968) similarly treated production as a particularly important factor in the affected employer's business, but also considered such activities as retail and wholesale deliveries, the curtailment of office and maintenance operations, and changes in the number of employees working during the strike.

*Id.* 437 P.2d at 318, 319. Similar reasoning was applied in *Monsanto Chemical Co. v. Thornbrough,* 229 Ark. 362, 314 S.W.2d 493 (1958)· and *Cumberland and Allegheny Gas Co. v. Hatcher,* 147 W.Va. 630, 130 S.E.2d 115 (1963), *overruled in part* in *Lee-Norse Co. v. Rutledge,* 291 S.E.2d 477 (W.Va.1982). The court in *Cumberland and Allegheny Gas Co.* discussed the applicable standard in detail:

It is conceivable that in some situations a strike or lockout affecting relatively few employees would produce a stoppage of work if such men were employed in the performance of duties of such vital nature that their unemployment would result in a substantial curtailment of the normal overall activities·or operations of the employer. On the other hand, in other situations the unemployment of a proportionately greater number of employees might have no substantial effect on the normal activities of the employer. In some situations, a substantial curtailment of work in a single category or department of the employer's operations might be of such a vital nature as to result in a substantial curtailment of the employer's overall activities if all categories or departments were of an interdependent nature; while, conceivably, in another and different situation, a complete cessation of work in a single category or department of some incidental or minor nature might produce no appreciable curtailment of the overall operations of the employer. 130 S.E.2d at 121.

This method of analysis is entirely in accord with the statutory standard set forth in § 288.040.5(2) and applied by the courts of this state in *Tri-State·Motor Co., supra,* 509 S.W.2d 217.[1] I believe that the Commission endorsed and applied the reasoning of the four cases it cited in support of its decision.

1. The majority apparently believes that the definition enunciated in § 288.040.5(2) is somehow different from the "substantial curtailment of overall operations" test employed by the vast majority of other jurisdictions. To the contrary see the comment of Professor Lewis at 45 U.Det.J.Urb.L. 319, 327, footnote 30, to the effect that the Missouri definition "incorporates" the accepted judicial standard, "spelling it out with some precision." Accord, *see Tri-State Motor Co.,* 509 S.W.2d 217 at 225.

I am unable to find in that decision the "error of law" discerned by the majority.[2]

Apparently the majority believes that the payment of unemployment compensation to these claimants would not be a good use of tax dollars. Our decision cannot be based on such factors. Section 288.040.5 expresses our legislature's judgment that the principle of state neutrality in labor disputes will *not* be disturbed if benefits are available only to persons unemployed "due to a stoppage of work which exists because of a labor dispute." "Whether or not the Act should compensate employees in this position is properly a choice for the legislature." *Continental Oil Co. v. Board of Labor Appeals, supra,* 178 Mont. 143, 582 P.2d 1236, 1243. We can best maintain governmental neutrality by applying the value-neutral "stoppage of work" test without considering extraneous factors. Missouri courts have commented on the "essential injustice of forcing an employer to assist in the financing of employees with whom the employer is engaged in a labor dispute, by requiring the payment of unemployment compensation benefits *during a work stoppage.*" *O'Dell v. Division of Employment Security,* 376 S.W.2d 137, 142 (Mo.1964). (emphasis ours). However, by the plain terms of the statute, this rationale cannot apply if there is no work stoppage. Commentators have recognized that the economic realities of a strike are significantly changed when the employer is able to continue substantially normal operations. Shadur, "Unemployment Benefits and the 'Labor Dispute' Disqualification," 17 U.Chi.L. Rev., 294, 298, 309. Apparently our legislature concluded that in such situations the financial impact on the employer would be less significant than the community interest in providing for the economic security of unemployed workers.

I would affirm the decision of the Commission on the "stoppage of work" issue and go on to consider the issue of whether the claimants were "available for work" within the meaning of § 288.040.1(2). The Commission did not address this issue and there is absolutely no evidence in the record showing whether or not any of the claimants intended to return to his position after the strike; whether any spent sufficient time in picketing or negotiations so as to preclude availability for other work; or whether any claimants were engaged in an active and sincere search for new work. I would hold that the circuit court acted properly in remanding this issue to the Commission for decision after an evidentiary hearing. *Chemtech Industries v. Labor and Industrial Relations Commission,* 617 S.W.2d 121, 125 (Mo.App.1981); *Trans World Airlines v. Labor & Industrial Relations Commission,* 627 S.W.2d 335, 339 (Mo. App.1982); *John Epple Construction Co. v. Labor and Industrial Relations Commission,* 647 S.W.2d 926 (Mo.App.1983).

---

2. The facts in *Aaron v. Review Board of Indiana Employment Security Division,* 440 N.E.2d 1 (Ind.App.1982), are indeed "strikingly similar" to the present case (as are the facts in *Cumberland and Allegheny Gas,* reaching an opposite result from *Aaron*), but the critical distinguishing factor is the manner in which the appellate court applied its standard of review. In *Aaron,* the trier of fact found that there *was* a stoppage of work; the appellate court affirmed, as it was bound to do because the "findings and conclusions were supported by the ... evidence," 440 N.E.2d at 2, and made in accordance with Indiana law. It may well be that *Aaron* expresses a "better view" of the facts, but the standard of review imposed upon this court by § 288.210, RSMo and Mo. Const. Article V, § 18, does not permit us to overturn an administrative decision in order to obtain a "better" result when that decision is factual and is supported by substantial evidence.