PAUL MUELLER COMPANY,
Plaintiff-(Employer)-Appellant,

v.

LABOR AND INDUSTRIAL RELA-
TIONS COMMISSION OF
MISSOURI, et al., Defendants-Respondents.

Kenneth ABEL, et al.,
Plaintiffs-(Claimants)-Appellants,

v.

LABOR AND INDUSTRIAL RELA-
TIONS COMMISSION OF
MISSOURI, et al., Defendants-Respondents.

Nos. 13721, 13727.

Missouri Court of Appeals,
Southern District, Division One.

Sept. 6, 1985.

Motion for Rehearing or to Transfer to
Supreme Court Denied Sept. 27, 1985.

Application to Transfer Denied
Nov. 21, 1985.

Lincoln J. Knauer, Farrington, Curtis, Knauer, Hart & Garrison, Springfield, for plaintiff-(employer)-appellant.

Benjamin J. Francka, Law Offices of Benjamin J. Francka, Springfield, for plaintiffs-(claimants)-appellants.

Rick V. Morris, Jefferson City, for defendant-respondent Div. of Employment Security.

Alan J. Downs, Jefferson City, for defendant-respondent Labor and Indus. Relations Comm.

PER CURIAM:

On July 11, 1980, claimants, who are machinists and metal workers, went on strike against the Paul Mueller Company (Employer) of Springfield, Missouri, because their employment contracts had expired the day before and no new labor agreement had been consummated. Employer, whose business includes the fabrication of stainless steel bulk milk-cooling tanks, wine processing vats, and related items, attempted to keep its business running during negotiations for new contracts with two employee groups by using engineers, sales persons, and other nonbargaining unit employees on the production line. As a consequence, sales suffered and the inventory of component parts declined. The strike ended when new contracts were ratified by the machinists and metal workers on November 1 and 2, 1980. Some of the strikers were immediately called back, while others were not, due to a lack of orders and component parts to fabricate tanks. Claimants applied for unemployment compensation benefits, pursuant to the Missouri Employment Security Law, Chapter 288, RSMo 1978, as amended. After protest by Employer, deputies of the Division of Employment Security (Division) determined that claimants were ineligible for benefits from July 13, 1980 through November 1, 1980, because their unemployment during that time frame was due to a labor dispute in which claimants had a direct interest. After appeals by claimants and Employer, an appeals referee of the Division issued written findings and modified the deputies' determination, so as to extend the period of ineligibility starting July 13, 1980, to November 29, 1980, instead of November 1, 1980, as had been determined by the deputies. Applications for review were filed by Employer and claimants, after which the Labor and Industrial Relations Commission of Missouri (Commission) entered an order affirming the decision of the appeals referee. The parties requested, and were granted, judicial review, pursuant to § 288.210.[1] The Circuit Court of Greene County affirmed the Commission's order. Claimants and Employer appeal.

█ Claimants contend the Commission erred in adopting the appeals referee's finding that the work stoppage due to the labor dispute did not end November 2, 1980. They claim the evidence before the referee clearly showed that any reduction in employment from prestrike levels result-

---

1. All statutory references are to RSMo 1978, as amended.

ed from a management decision not to resume full production after the strike for reasons unrelated to the labor dispute. Employer contends 1) there was no competent and substantial evidence presented from which the referee could reasonably have found that the work stoppage caused by the strike had ceased by November 29, 1980; 2) that the referee·had improperly shifted the burden of proof on the unemployment issue from claimants to Employer, and 3) that the referee had ignored certain undisputed evidence offered by Employer, such as loss of business due to the strike, in arriving at his determination. We observe first that Employer's claim that the appeals referee improperly shifted the burden of proof, by requiring that Employer prove that the after strike reduction in its work force was caused by the strike rather than have claimants prove that it was not, is not supported by the record. We also observe that if the referee chose to disbelieve or ignore certain of Employer's evidence, even if it was uncontradicted, he had a right to do so. *Chemtech Industries, Inc. v. Labor and Industrial Relations Commission*, 617 S.W.2d 121, 124[5] (Mo.App.1981). The only legitimate issue here is whether the referee's determination, adopted by the Commission, that the work stoppage occasioned by the strike ended on November 29, 1980, is supported by competent and substantial evidence. Our function as the reviewing court is to decide, based on the record, whether the Commission via its affirmance of the referee's decision could have reasonably reached the result that it did.

Section 288.040.5(1) provides that a claimant is ineligible for benefits for any week in which the deputy finds that his unemployment is due to a stoppage of work caused by a labor dispute in which he has a direct interest. Stoppage of work is defined in § 288.040.5(2) as "a substantial diminution of the activities, production or services at the establishment, plant, factory or premises of the employing unit."

Each case involving the question raised here must be determined by its own facts, as there is no statutorily fixed percentage of diminution of an employer's activities, production or services after a strike which automatically determines when a work stoppage begins or ends. *Tri-State Motor Transit Co. v. Industrial Commission, D. of E.S.*, 509 S.W.2d 217, 224[6] (Mo.App. 1974).

We recognize that activities, production, and services are broad terms which reflect legislative intent that the full range of activities and services performed by the Employer, as well as production, both before and after a strike, must be considered in deciding when a work stoppage brought on by a labor dispute ends. *Laclede Gas Co. v. Labor and Industrial Relations Commission*, 657 S.W.2d 644, 650 (Mo.App. 1983).

■ The decision of the appeals referee, which was adopted and affirmed by the Commission, contains the following findings:

The employer is engaged in the business of fabricating stainless steel bulk milk-cooling tanks, pharmaceutical equipment, dairy and food processing equipment, winery and alcohol-related vats and other stainless steel products. Its bulk milk-coolers are sold throughout the world and its annual sales exceed $50,000,000. Its operation consists mainly of fabrication, sales and engineering. The engineering department does, among other things, design modification in its 'make-to-order' products. Each phase of the operation is subdivided into departments which are coordinated to integrate the flow of work.

The claimants worked on the fabrication and shipment of the products. The Sheetmetal Workers International Association, Local No. 208, is the accredited collective bargaining representative for sheetmetal members who worked for the employer and the International Association of Machinists and Aerospace Workers, Lodge No. 1316, represents the machinist employees. Each of the claimants was a member of one of these unions prior to the strike. The employer's

collective bargaining agreement with both unions expired on July 11, 1980. Commencing July 11, 1980, both unions established picket lines at the employer's premises and maintained the lines until October 30, 1980. Negotiations for new collective bargaining agreements continued through the strike and oral agreement was reached on October 30, 1980, with subsequent ratification by the members of the unions on November 1, and 2, 1980.

Throughout the strike, the total hours worked by all classes of employees ranged from 24 percent to 27 percent of the hours averaged in the six months before the strike. In November and December 1980, the total hours worked by all classes of employees were respectively 56 percent and 83 percent of the hours averaged in the six months before the strike. By the end of November 1980, 79 percent of the average number of employees working in the first six months of 1980 were back at work and 88 percent were back to work by the end of December 1980. Approximately one-half of the machinists were called back to work immediately after the strike and all were recalled according to seniority. Pursuant to a recall agreement, the metal workers were recalled for the 30 days following the strike on an 'as need' basis without regard to seniority in order to establish an orderly work flow in the plant. Recovery was slowed in part by the necessity of requalifying the stainless steel welders to meet the requisite ASMC code.

Throughout the strike, an average of 200 of the 275 non-bargaining unit employees were engaged in production work in the employer's plant each day. These people consisted of sales people and engineers, together with their support staff. Consequently, the amount of engineering design on 'made-to-order' items and new sales dropped. Also business was lost due in part to the uncertainty of delivery dates. These people completed fabrication of unfinished tanks, shipped tanks and spare parts, and depleted the stock of component parts needed to assemble tanks. The employer fabricates two-thirds to three-fourths of its products' component parts and endeavors to maintain a two-week supply of the parts in stock. With these people working in production, a component part inventory on thousands of parts could not be kept current. The employer subcontracted the fabrication of some of its parts to local manufacturers as a consequence of the strike but could not subcontract work on some of its key specialty items, some of which were used in 70 percent of the employer's products. These events led to delays in resumption of production and sales following the strike which still affected the employer's operations at the time of the hearing. Sales have been lost and sales have been delayed as a consequence of the strike.

\* \* \* \* \* \*

... It is found that the end of November 1980 marks the point when the staggered recall of employees brought the work force to substantially what it was before the strike and although the parts supply and ability to fill orders was still adversely affected, the employer was in a substantially good position to fill 'made-to-order' products and improve the parts supply. It is accordingly found that during the period from July 13, 1980 through November 29, 1980, the unemployment of these claimants was due to a stoppage of work which existed because of a labor dispute in the employer's factory or premises and that all claimants participated in and were directly interested in the labor dispute. It is also found that the unemployment of the claimants after November 30, 1980, was not due to a stoppage of work which existed because of a labor dispute at the employer's factory and premises.

These findings are supported by competent and substantial evidence in the record. They support the inference that Employer's business, which had clearly been hampered by the strike, had shown substantial recovery by November 30, 1980, so that there

was no longer after that date a substantial diminution of the Employer's activities, services, or production caused by the labor dispute.

Even though the disqualifying period was extended by the referee for 30 days past the end of the strike, such action has been held to be permissible in order to permit Employer to substantially resume normal operations without penalty. *Abrey v. National Cash Register Co.*, 49 Ohio Misc. 19, 359 N.E.2d 1028, 1033[7] (1974).

The order of the circuit court, affirming the Commission's decision denying claimants' unemployment compensation benefits for the period prior to November 29, 1980, but allowing them after that date, is affirmed.

All concur.